**Lourdes CORDERO, Appellant**

v.

**TENET HEALTHCARE CORP.,
et al., Appellees.**

No. 05–05–01329–CV.

Court of Appeals of Texas,
Dallas.

May 31, 2007.

William A. Brewer III, Michael J. Collins, and Robert E. Easley, Jr., Bickel & Brewer, Storefront, P.L.L.C., Dallas, for Appellant.

Robert B. Krakow, Gibson, Dunn & Crutcher, L.L.P., and Peter D'Apice, Stutzman, Bromberg, Esserman & Plifka, P.C., Dallas, for Appellee.

Before Justices WRIGHT, BRIDGES, and MAZZANT.

## OPINION

Opinion by Justice WRIGHT.

Lourdes Cordero appeals from a summary judgment rendered in favor of Tenet Healthcare Corp., Tenet Texas Employment, Inc., Jeffrey C. Barbakow, David L. Dennis, Alan R. Ewalt, Thomas B. Mackey, and Christi R. Sulzbach (collectively "Tenet"). In three issues, Cordero contends the trial court erred in granting summary judgment because: (1) the release was procured by fraud and, therefore, voidable; (2) she did not ratify the contract; and (3) she did incur damages. We overrule Cordero's issues and affirm the trial court's judgment.

### Background

Cordero worked for American Medical International when it was acquired by Tenet in 1995. She eventually became Vice President of Human Resources at Tenet. In her position with Tenet, she was granted stock options to purchase Tenet stock. Under the stock option plan, each option vested in one-third increments on the first, second, and third anniversaries of the date granted. Once the options vested, they could be exercised at any time within ten years of the option granted. However, once an individual ceased to be an employee of Tenet, his or her unexercised options would terminate.

In addition to the stock options, Cordero also had a Supplemental Retirement Benefit Agreement (SRBA) with Tenet. Under the SRBA, Cordero would receive up to $30,000 annually if she retired at the age of 55 with at least ten years of service with Tenet.

Cordero decided that she wanted to take early retirement sometime after turning age 55 in 2001. She and Tenet engaged in extensive negotiations concerning her early retirement. As part of her early retirement, Cordero sought exceptions that would allow her to (1) receive the full $30,000 in annual retirement pay even though under the SRBA she would only be entitled to $17,000 and (2) have her unvested stock options vest with the right to take those options to term. Tenet would not meet Cordero's request with respect to the SRBA. However, Tenet partially accommodated Cordero with respect to the stock options.

On April 12, 2002, Cordero and Tenet entered into the Resignation Agreement. Pursuant to this Agreement, Tenet allowed Cordero to remain on the payroll as a consultant for a period of time referred to as the salary continuation period. During this period, Cordero's options would continue to vest and she could exercise them. Tenet also agreed to pay Cordero fifty percent of her previous salary in return for forty hours a month of consulting services. The Agreement called for the salary continuation period to end on January 31, 2003. Following this period, Cordero was to be placed on two months' leave of absence. The Agreement contained a broad release clause.

On the date the Agreement became effective, May 1, 2002, Tenet's stock price was $73.66. In July 2002, Tenet stock split 3:2, with shareholders receiving three shares for every two shares they owed at the time of the split. Following the split,

the price of Tenet stock reduced by one-third to neutralize the financial impact of the split. On September 13, 2002, Tenet's stock was trading at $51.18. The following day, Cordero placed limit orders on her options directing that 11,250 of her options be sold if the stock price rose to $53.33 and another 11,250 options sold if the price rose to $54.33. The stock price rose up to $52.50 in early October. However, on October 28, 2002 a market analyst alleged that Tenet was taking advantage of a loophole in the Medicare reimbursement regulations. Two days later, allegations were made that two cardiologists at a Tenet-owned hospital were performing an excessive number of cardiac procedures. As a result of these allegations, the price of Tenet stock plummeted.

Following this turn of events, Cordero sought to renegotiate the Agreement. She sent a letter to Tenet Vice President, David Ewalt, on December 12, 2002, requesting that all of her stock options vest and that she be permitted to hold them for their full terms. She also requested that she receive additional service credit to enable her to receive the full $30,000 per year in supplemental retirement benefits. Tenet refused Cordero's request to modify the Agreement.

Cordero filed suit alleging claims for fraud, negligent misrepresentation, statutory fraud, violations of the Texas Securities Act, and civil conspiracy. Tenet moved for summary judgment on the grounds that Cordero released all of her claims, ratified the contract, and that the alleged fraud did not damage Cordero. The trial court granted Tenet's motion for summary judgment and this appeal timely followed.

### Standard of Review

The standard of review for a summary judgment is well-established.

Tex.R. Civ. P. 166a(c); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 23 (Tex. 1990). In reviewing a traditional motion for summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgm't Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). To prevail on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982). When multiple grounds for summary judgment are raised and the trial court does not specify the ground or grounds relied upon for its ruling, the appellate court will affirm the summary judgment if any of the grounds advanced in the motion are meritorious. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001).

## Ratification

In her second issue, Cordero contends the trial court erred in granting summary judgment on the ground that she ratified the Agreement after learning of the fraud. She contends this was error for two reasons. First, Cordero contends her continued acceptance of payments from Tenet was not inconsistent with her intent to rescind the Agreement. Second, she contends at the time she allegedly ratified the Agreement, she lacked full knowledge of the fraud.

■ If a party who has been induced by fraud to enter into an agreement engages in conduct that recognizes the agreement as binding after the party becomes aware of the fraud, the party ratifies the agreement and waives any right to assert fraud as a ground to avoid the agreement. *Rosenbaum v. Texas Bldg. & Mort. Co.*, 140 Tex. 325, 167 S.W.2d 506, 508 (1943); *PSB, Inc. v. LIT Indus. Texas Ltd. Partnership*, 216 S.W.3d 429, 432 (Tex.App.-Dallas 2006, no pet. h.); *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex.App.-Amarillo 2004, pet. denied). Any act inconsistent with an intention to avoid the agreement has the effect of waiving the right of rescission. *Id.* Once a party ratifies an agreement, that party may not later withdraw the ratification and seek to avoid the agreement. *Harris*, 134 S.W.3d at 427.

■ Cordero asserts in her brief that "[a]t no time after Cordero learned of Tenet's illegal billing practices did Cordero convey to Tenet, or anyone else for that matter, that she consented to continue to be bound by the terms of the Agreement." The record does not support Cordero's allegation. The record shows both that Cordero continued to perform her obligations under the Agreement and that she accepted the benefits under the Agreement. In her deposition, Cordero testified as follows:

Q. Going back to the discussions in late 2002 and early 2003 when you asked that your resignation agreement be renegotiated and Al Ewalt told you in early January of 2003 that the company would not do that, isn't it true that you continued thereafter to accept benefits provided to you under the resignation agreement?

A. Yes. I was still doing some consulting work for them and I was still solving my issue.

Q. You continued for several more months to receive your salary continuation payments, correct?

A. I received that 50 percent of salary continuation and then the rest of them were my actual consulting compensation for my consulting services, yes.

Q. Right. You were paid amounts per hour over and above the 50 percent salary continuation.

A. Right.

Q. And you received other benefits in that salary continuation period, correct?

A. Correct.

Q. And you waited until May of 2003 to exercise your remaining options that were still in the money, correct?

A. I had no choice, no option. I was getting out of payroll at that time.

Q. Right. I mean, but for the—the resignation agreement terms you would have had to have exercised that option sooner?

A. Yes.

Q. You didn't come back to Mr. Ewalt and say, oh gee, Al, if you're not willing to do this for me, I want to cut things off right now, I want to terminate the resignation agreement, I'm leaving, I'm not going to work for you anymore, don't send me any money?

A. Not—the conversation didn't take place like that, no.

Q. You chose to accept the full benefits coming to you under that agreement and then you sued, right?

[Attorney]: Objection. But you can answer.

A. I was receiving what was owed to me.

Cordero testified that Tenet provided everything it agreed to provide under the Agreement and that she accepted all the benefits under the Agreement.

Cordero claims the payments she accepted were money owed to her as a full-time employee. She states in her appellate brief, "Cordero's subsequent acceptance of payments is consistent with her intent to rescind the Agreement. In the absence of the Agreement, Cordero was entitled to her full salary. Once Cordero rescinded the Agreement, Tenet was obligated to remit payment to Cordero in the amount of her full salary." However, the payments she accepted were pursuant to the Agreement for part-time consulting work. She was not working full-time and was not entitled to her previous full-time salary. Moreover, her above-quoted deposition testimony shows that the payments she continued to accept after Tenet refused to renegotiate the terms of the Agreement were payments pursuant to that Agreement.

Cordero contends that ratification is not established as a matter of law if the conduct is also consistent with a plaintiff's intention to rescind. She cites *Sawyer v. Pierce*, 580 S.W.2d 117 (Tex.Civ.App.-Corpus Christi 1979, writ ref'd n.r.e.) as support for this proposition. *Sawyer*, however, is not on point. In *Sawyer*, sellers offered land for sale representing that it would accommodate thirty trailers. *Id.* at 120. Purchasers bought the land and subsequently learned that county regulations would only allow fifteen trailers on the land. Purchasers thought the sellers had made an innocent mistake and sought to renegotiate the sale price. *Id.* The sellers refused to renegotiate. About one month after the sellers' refusal to renegotiate, the purchasers learned that the sellers had been aware of the county regulations at the time of the sale. At that point, the purchasers immediately sought rescission. *Id.* at 121. The facts in *Sawyer* are in stark contrast to the facts in this case. The purchasers in *Sawyer* sought rescission immediately when they learned of the fraud. Cordero did not do the same. Rather, after learning of the alleged fraud,

Cordero continued to be bound by the Agreement and accepted all benefits under the Agreement.

Although, she claims that she wanted to rescind the Agreement, she never asked Tenet to rescind it. The record shows only that she tried to modify the Agreement. Her December 12, 2002 letter to Ewalt asked for two modifications to the Agreement, not for rescission. She further states in that letter her willingness to continue consulting on a per diem basis "as I have done since my retirement."

We conclude that Cordero's conduct revealed her intent to be bound by the Agreement. There is no evidence in the record that she told Tenet of her intent to rescind the Agreement. We conclude her conduct following Tenet's refusal to renegotiate the Agreement is inconsistent with any intent to rescind the Agreement.

Cordero also contends the trial court erred in granting summary judgment on the ground of ratification because she lacked full knowledge of the alleged fraud at the time she purportedly ratified the Agreement. Again, Cordero's conduct does not support her contention. Cordero sought to renegotiate the Agreement *because* of the fraud.

All of Cordero's allegations of fraud asserted in her petition were known to her when she sought renegotiation of the Agreement in December of 2002. She states in her brief, "It was only when Defendants refused to renegotiate that Cordero realized that Defendants were, indeed, unethical, and that the public allegations of Defendants' unlawful billing practices must have some truth to them." Tenet informed Cordero on January 10, 2003 that it would not renegotiate the terms of the Agreement. From that date forward, Cordero continued to perform her obligations and accept payments pursuant to the Agreement. Thus, by her own admission, the alleged ratifying conduct occurred after she had full knowledge of the fraud.

We conclude the summary judgment evidence established that Cordero ratified the Agreement. We overrule her second issue. We affirm the trial court's judgment. Because of our disposition of Cordero's second issue, we do not address her other two issues.