

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00201-CV

**BANK OF AMERICA, N.A.** as Trustee of Bettye Baker Brown Trust, u/w, f/b/o William David Deiss, Trustee of Bettye Baker Brown Trust u/w, f/b/o Dianne Elizabeth Mysliwiec, Trustee of Bettye Baker Brown Trust, u/w, f/b/o Paula Jane Roberts, Trustee of Bettye Baker Brown Trust, and Baker E. Shaw, as Trustee of Dorothy Ann Roos Testamentary Trust,
Appellants

v.

**PRIZE ENERGY RESOURCES, L.P.**, Prize Operating Company, Gruy Petroleum Management Company n/k/a Cimarex Energy Co. of Colorado, Magnum Hunter Resources, Inc., Cimarex Energy Co., Hunter Gas Gathering, Inc., Pat R. Rutherford Jr., Michael G. Rutherford, Stevan D. Rutherford, Patrick R. Rutherford, III, David Traylor Rutherford, John Richard Rutherford, Mary Elizabeth Rutherford, Paul Maroney Rutherford, Michael G. Rutherford, Jr., Sally Ann Rutherford, and Rutherford Oil Co.,
Appellees

From the 343rd Judicial District Court, McMullen County, Texas
Trial Court No. M05-0002-CV-C
Honorable Michael E. Welborn, Judge Presiding

Opinion by: Patricia O. Alvarez, Justice

Sitting: Marialyn Barnard, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: August 29, 2014

REVERSED AND REMANDED

This case stems from a dispute over the effects of the termination of an oil, gas, and mineral

lease and a joint operating agreement (JOA). The lease in question, the Baker Lease, is located in

McMullen County. The Baker Trusts, represented by Bank of America, and the Rutherfords[1] are lessors of the Baker Lease. The Bank and the Rutherfords each own a 25% mineral interest subject to the Baker Lease. The remaining 50% mineral interest is equally split between the Rutherfords and the drilling company. The mineral interests contained within the Baker Lease are subject to the JOA in question.

In August of 2001, after a seventy-one day period when the wells on the Baker Lease were not operating or producing in paying quantities, both the Baker Lease and the JOA terminated. The effect of the Baker Lease termination, and likewise the JOA termination, meant each party, specifically the Bank, was entitled to a one-fourth share of production, less costs, rather than only the one-eighth royalties provided for in the Baker Lease. Appellees moved for summary judgment asserting (1) the Bank ratified the Ratification thereby waiving its right to seek rescission of the Ratification; (2) the Bank was prevented by quasi-estoppel from seeking such rescission; and (3) the evidence conclusively established adverse possession of the Baker Lease. The trial court held there was no evidence to support the Bank's claims and dismissed the Bank's claims with prejudice.

Because the summary judgment evidence raises genuine issues of material fact negating the trial court's grant of summary judgment, we reverse the trial court's order granting summary judgment and remand this matter to the trial court for further consideration consistent with this opinion.

---

[1] Michael G. Rutherford and Patrick R. Rutherford, Jr., and their children, who are the heirs of P.R. Rutherford, and Rutherford Oil Corporation

**FACTUAL BACKGROUND**

**A.      The Baker Lease**

In 1986, the original drilling operator, Atlantic Richfield Company, entered into a purchase and sale agreement with Prize Energy.  Under the terms of the agreement, upon any sixty-day cessation of production, the Baker Lease and the JOA automatically terminated and ownership of the mineral interests reverted back, in equal portions, to Bank of America, as Trustee, the Rutherfords, Burlington Resources, and Atlantic Richfield Company.

The Baker Lease provided as follows:

> If, at the expiration of the primary term, oil, gas, or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force *so long as operations on said well or for drilling or reworking of any additional well[s] are prosecuted with no cessation of more than sixty (60) consecutive days*, and if they result in production of oil[,] gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith.

(emphasis added).  The JOA further provided as follows:

> This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise.

**B.      The Baker Lease and the JOA Expire and Hoskins Files Suit**

Between June and August of 2001, there was a seventy-one day period when the wells on the Baker Lease were not operating or producing in paying quantities.  None of the lessors was aware of the cessation of operations, and no one raised any concern at the time.  The production resumed, and the drilling operator continued developing the property and completed additional producing wells.

In 2004, Cliff Hoskins conducted research regarding the Baker Wells and discovered the possible termination of the Baker Lease and the JOA in August of 2001.  The effect of the Baker

Lease termination, and likewise the JOA termination, meant the Lessors were entitled to a one-fourth share of production, less costs, rather than only the one-eighth royalties provided for in the Baker Lease. Hoskins approached BP American Production Company, the successor to the Atlantic Richfield Company's mineral interests.[2] Hoskins reported that, based on his assessment, the lease and the JOA terminated due to cessation of operations. Hoskins and BP then executed a conditional lease option agreement regarding BP's 25% mineral interest. Hoskins sent a demand letter to the parties and on January 25, 2005, Hoskins filed suit to quiet title.

## C.     The Bank Signs the Ratification

On the same day that Hoskins filed suit, Prize and the Rutherfords (jointly Appellees) approached the Bank and requested the Bank sign a Ratification to the Baker Lease. When questioned, the Rutherfords assured the Bank there was no cessation of production and that the Baker Lease had not expired. The Rutherfords further claimed Hoskins's demand letter and suit were frivolous and an attempt to extort money. Moreover, the Rutherfords explained "the mere existence of the allegations set forth in the Demand Letter would expose [the Leased Property] to substantial drainage by offset operators." To avoid suspension of the drilling activities, the operators were requesting the Bank sign the Ratification as soon as possible. After meeting with the Bank, the Rutherfords provided the Bank with a copy of Hoskins's demand letter and data attempting to convince the Bank that the Baker Lease did not expire. The Bank signed the following Ratification on February 14, 2005:

> NOW, THEREFORE, for good and valuable considerations received by each of the Baker Trusts and the Rutherfords, the receipt and sufficiency of which

---

[2] In 1994, by assignment effective October 1, 1993, Atlantic Richfield Company assigned to Vastar Resources, Inc. the 25% mineral interest and associated royalty right. BP American Production Company succeeded through a series of mergers and name changes to the 25% mineral interest of Vastar Resources, Inc., and the associated royalty right. On or about January 15, 2007, by Mineral Deed with an effective date of August 16, 2004, BP conveyed its 25% mineral interest to Cliff Hoskins, Inc., reserving only a perpetual 1/16th nonparticipating royalty interest.

are hereby acknowledged, and in consideration of Lessees' undertakings under the Lease, the Baker Trusts and the Rutherfords hereby stipulate and agree as follows:

> 1. Each of the Baker Trusts and each of the Rutherfords (collectively, the "Mineral Owners") hereby stipulates and agrees that (a) the Lease is currently in full force and effect and (b) the term of the Lease has been continuously perpetuated since April 23, 1971, by either (i) the production of oil and/or gas in paying quantities or (ii) operations, or both.
>
> 2. Without limiting the foregoing, (a) each of the Baker Trusts hereby (i) ratifies and adopts the Lease insofar as it covers or applies to the Leased Premises and (ii) grants and leases the Leased Premises to the Lessees upon the terms and provisions set forth in the Lease, and (b) each of the Rutherfords hereby (i) ratifies and adopts the Lease insofar as it covers or applies to Survey 3 and (ii) grants and leases Survey 3 to the Lessees upon the terms and provisions set forth in the Lease.
>
> 3. Each of the Mineral Owners hereby waives and releases any and all claims that the Lease terminated prior to the date of execution of this instrument for any reason whatsoever.

After the Bank signed the Ratification, Hoskins amended his petition and named the Bank as a defendant. After discovering the Baker Lease terminated and the Rutherfords' attempts to preclude the Bank's discovery of such, the Bank filed suit against Appellees, including affirmative claims for removal of a cloud on title and for declaratory relief, fraud, fraudulent inducement, conversion, unjust enrichment, violation of Texas Natural Resource Conservation Commission rules, statutory fraud, rescission of its Ratification, and a claim to quiet title to the Baker Trusts' mineral interest.

## C. *Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.* (*Prize I*)

The parties were previously before this court in *Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.* (*Prize I*), 345 S.W.3d 537 (Tex. App.—San Antonio 2011, no pet.).

On February 5, 2009, the trial court entered partial summary judgment, providing, in pertinent part, as follows:

(1)     Granted the summary judgment motion by Appellees on all claims by the Bank, "including claims of fraud and rescission of the Ratification," and ordered that the Bank take nothing; and

(2)     Granted the declaratory relief that the Baker Lease and the JOA terminated in August 2001.

On February 23, 2011, this court issued *Prize I*, holding as follows:

(1)     the Baker Lease terminated in August of 2001 due to cessation of production for more than sixty consecutive days;

(2)     the Bank was not aware the Baker Lease expired;

(3)     the evidence raised a fact issue as to whether Appellees made false statements of fact to the Bank;

(4)     the evidence raised a fact issue regarding the Bank's reliance on Appellees' misrepresentations;

(5)     the Bank would not have signed the Ratification as a whole but for the material misrepresentations made by Appellees and justifiably relied upon by the Bank; and

(6)     "the mere fact that the Ratification contains renewal or revivor language does not establish as a matter of law that the Bank was not induced to execute the Ratification by [Appellees'] misrepresentations that the Baker Lease had not expired."

*Id*. at 577–87. *Prize I* reversed the trial court's grant of summary judgment on all the Bank's claims and remanded the matter to the trial court for further proceedings on the Bank's claims. *Id*. at 588. We note, however, *Prize I* also acknowledged that whether the Bank "ratif[ied] the agreement and waiv[ed] any right to assert fraud as a ground to avoid or rescind the Ratification" was not raised by the summary judgment and not addressed in its opinion. *Id*. at 586–87.

**D.     *Bank of America v. Prize Energy Resources, L.P.***

On July 31, 2012, Appellees filed a subsequent traditional motion for summary judgment asserting (1) the Bank ratified the Ratification thereby waiving its right to seek rescission of the Ratification, (2) the Bank was prevented by quasi-estoppel from seeking such rescission, and (3) the evidence conclusively established adverse possession of the Baker Lease. Appellees also filed a no-evidence motion for summary judgment. The trial court held there was no evidence to support

the Bank's claims. On January 16, 2013, the trial court granted Appellees' motions for summary judgment and dismissed the Bank's claims with prejudice.

On appeal, the Bank argues the trial court erred in granting summary judgment because the evidence does not conclusively establish every element of the affirmative defenses of ratification, waiver, quasi-estoppel, and adverse possession. The Bank also argues there are genuine issues of material fact sufficient to rebut both the traditional and no-evidence summary judgment motions.

### STANDARD OF REVIEW

An appellate court reviews a traditional summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 805 (Tex. App.—Dallas 2008, pet. denied). To obtain summary judgment, the movant must establish there are no issues of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548 (Tex. 1985). "An appellate court reviewing a summary judgment must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam); *accord W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005); *Nixon*, 690 S.W.2d at 548–49. When reviewing a summary judgment, we "must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented." *Goodyear Tire*, 236 S.W.3d at 755.

In reviewing the granting of a no-evidence summary judgment, we apply the same legal sufficiency standard as we apply in reviewing a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). The nonmovant in a no-evidence motion for summary judgment has the burden to raise a genuine issue of material fact by producing more than a scintilla

of probative evidence. *See id.* at 751; *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). "[T]he evidence must be viewed in the light most favorable to the non-movant." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Moore*, 981 S.W.2d at 269.

RESCISSION OF THE RATIFICATION

By granting Appellees' traditional motion for summary judgment, the trial court determined that, as a matter of law, the Bank ratified the Ratification and waived its right to seek rescission of the Ratification. We first set out the law regarding waiver and ratification and then review the summary judgment evidence supporting each.

**A.      Waiver and Ratification**

*1.      Waiver*

"Waiver is defined as 'an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)); *accord Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 111 (Tex. App.—San Antonio 2011, pet. denied) (same). The party asserting waiver bears the burden to establish each element of its affirmative defense. *Geis*, 362 S.W.3d at 111; *see also* TEX. R. CIV. P. 94. "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan*, 111 S.W.3d at 156; *accord Geis*, 362 S.W.3d at 111. Appellate courts look to the "acts, words, or conduct of a party to determine if it unequivocally manifested an intention to no longer assert the right in question." *Geis*, 362 S.W.3d at 111 (internal quotation marks omitted).

2.      *Ratifying Acts*

"Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that did not then legally bind him and which he could have repudiated." *K.B. v. N.B.*, 811 S.W.2d 634, 638 (Tex. App.—San Antonio 1991, writ denied); *accord Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.); *Thompson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 165 (Tex. App.—Tyler 2011, no pet.). Proof of ratification requires evidence establishing "(1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act." *K.B.*, 811 S.W.2d at 638; *accord Samms v. Autumn Run Cmty. Improvement Ass'n, Inc.*, 23 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

Importantly, however, if the ratifier knows of the fraud and then chooses to perform under the contract, even "a contract procured by fraud can be ratified." *Thompson Oil*, 351 S.W.3d at 165. "When a party ratifies an agreement that has been induced by fraud, the ratification generally vitiates the fraud." *Contra Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000); *but see Chambers v. Equity Bank, SSB*, 319 S.W.3d 892, 902 (Tex. App.—Texarkana 2010, no pet.); *Cordero v. Tenet Healthcare Corp.*, 226 S.W.3d 747, 751–52 (Tex. App.—Dallas 2007, pet. denied). Any act taken by a party that is "inconsistent with an intention to avoid the agreement" effectively waives the party's right of rescission. *Cordero*, 226 S.W.3d at 750. "Once a party ratifies an agreement, that party may not later withdraw the ratification and seek to avoid the agreement." *Id.* (citing *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied)); *accord Thompson Oil*, 351 S.W.3d at 166.

The burden rests on the party asserting "ratification [to] prove that the ratifying party acted upon full knowledge of all material facts." *K.B.*, 811 S.W.2d at 638; *accord Thompson Oil*, 351 S.W.3d at 165–66. To be entitled to traditional summary judgment, Appellees were, therefore,

required to conclusively prove the Bank possessed knowledge of all the material facts and manifested clear intent to waive fraud. *Fortune Prod. Co.*, 52 S.W.3d at 677; *see also K.B.*, 811 S.W.2d at 638; *Thompson Oil*, 351 S.W.3d at 165–66. To avoid no-evidence summary judgment, the Bank only had to raise a genuine issue of material fact. *King Ranch, Inc.*, 118 S.W.3d at 751

## B. Arguments of Parties

### 1. Appellees' Arguments

Appellees assert that regardless of whether the Bank was fraudulently induced into signing the Ratification, the Bank cannot now seek to avoid it. *PSB, Inc. v. LIT Indus. Tex. Ltd. P'ship*, 216 S.W.3d 429, 433 (Tex. App.—Dallas 2006, no pet.). Appellees point to the language within the Ratification itself as proof the Bank waived its claims. Appellees contend that, even assuming the Bank was fraudulently induced, such fraud does not vitiate the Bank's ratification of the contract and the ensuing effect of being barred from seeking rescission or damages. *Fortune Prod.*, 52 S.W.3d at 678. Appellees challenge the Bank's assertion that it lacked full knowledge until "just prior to filing suit." They argue the Bank *knew* of the alleged fraud eighteen months prior to filing suit, accepted $106,000 in consideration for signing the Ratification, and, for over five years, *continued* to accept benefits in royalties and signed division orders exceeding $500,000.

### 2. The Bank's Arguments

The Bank counters the issues raised by Appellees were resolved in *Prize I* when this court concluded there were genuine issues of material fact concerning whether the Ratification was induced by fraud. In discussing information provided by Prize and the Rutherfords, and the Bank's reliance thereon, the *Prize I* Court concluded "[t]he summary judgment record raises [material] fact issue[s when] the time the Bank signed the Ratification." *Prize I*, 345 S.W.3d at 583. The Bank argues the Appellees misrepresented the status of the Baker Lease and the current summary judgment evidence does not provide any new material facts regarding the same. The Bank further

contends Appellees failed to present any proof of the Bank's intent to waive its claim.  *See Fortune Prod.*, 52 S.W.3d at 677 (quoting *Kennedy v. Bender*, 104 Tex. 149, 135 S.W. 524, 525 (Tex. 1911)) ("'Acts which, although in affirmance of the contract do not indicate any intention to waive the fraud, cannot be held to operate as a waiver.'").

On April 12, 2006, the Bank signed division orders for two of the Baker Wells.  The Bank argues each division order expressly states it "does not constitute ratification of any oil and/or gas lease . . . and does not amend or alter the lease or any amendment thereto"; and, by their very language, the division orders raise questions of fact and cannot ratify the Ratification.  Additionally, the division orders were revoked, as a matter of law, when the Bank served the petition in August 2006 asserting an interest different than that expressed in the April 2006 division orders.

## C.    Evidence Supporting Knowledge of Actual Fraud

Our review is limited to whether the evidence of material misrepresentations raised a question of fact regarding the Bank's knowledge of actual fraud.

*1.  The Bank's Evidence of Material Misrepresentations Supporting Lack of Knowledge*

In support of its argument that it did not possess knowledge of the actual fraud, the Bank set forth the Rutherfords' attempts to mislead the Bank regarding the termination of the Baker Lease.  On January 6, 2005, Mike Rutherford approached the Bank and assured the Bank that the Baker Lease did not terminate.  The Bank contends that, but for being misled by Appellees, the Bank would not have signed the Ratification.  In support of its claims, the Bank presented the following evidence:

(1)    Rutherford's assurances that Hoskins' threatened lawsuit was frivolous, an attempt to extort money, and that even the threat of such suit would cause them to stop development of the property and leave the property at risk of drainage;

(2)     Rutherford's letter attaching the production data (including P-2's and gauge reports for Baker No. 6 well) and his explanation of why the Baker Lease did not terminate;

(3)     Rutherford's claims the production information was provided by Prize;

(4)     Rutherford's assertion that in order to avoid suspension of drilling activities operators requested the Bank promptly sign the attached Stipulation and Ratification;

(5)     Data indicating the Baker Well No. 4 had been shut-in for a swabbing operation in April of 2001, which was not successful and was shut-in for further evaluation;

(6)     Data indicating the Baker Well No. 6 production volumes were not fully registered by gas metering equipment during relevant time period and Prize confirmed that "sales figures" (reported on P-2s are HPL's meter figures) and "lease use figures" (estimates of quantifies of gas consumed on the lease for the operation of equipment and/or quantities lost to venting); and

(7)     Gauge Sheets explaining that although Baker Well No. 6 well was "shut in for buildup" for most of June, July, and the first half of August, the well actually produced for a three-day period (6/15–6/17) and, therefore, there was no cessation for a sixty-day period.

*2.     Appellees' Evidence Supporting Knowledge*

As evidence of the Bank's knowledge supporting the Ratification, Appellees look to the Bank's acceptance of royalty payments and its execution of division orders after it had full knowledge of Appellees' fraudulent behavior. More importantly, however, Appellees look to the direct evidence the Bank possessed prior to signing the Ratification.

(1)     Hoskins's January 3, 2005 letter regarding anti-spoliation and alleging Appellees had hidden facts from the Bank;

(2)     Hoskins's January 7, 2005 demand letter detailing his claims that the Baker Lease had expired;

(3)     A memorandum regarding production data;

(4)     Prize's original and amended and corrected P-2 forms;

(5)     Prize's gauge and production reports;

(6)     On February 14, 2005, in exchange for $106,637.50, the Bank signed the Ratification providing the Baker Lease was in full force and effect, the property was leased based on the terms contained in the Baker Lease, and waiving any claim the Baker Lease terminated;

(7)     Hoskins's pleadings alleging Appellees fraudulently concealed termination of the Baker Lease (Hoskins filed four different amended petitions *after* the Bank signed the Ratification);

(8)     In his Second Amended Petition, filed on April 1, 2005, Hoskins named the Bank as a defendant and specifically alleged the Baker Lease had terminated in 2001;

(9)     In June of 2005, Hoskins's attorney sent correspondence to the Bank asserting Appellees "hid facts" from the Bank;

(10)    In July of 2005, the Bank attended the deposition of Neil Etheridge, a production foreman at Prize wherein Etheridge testified there was no contemporaneous record of gas flaring in June of 2001;

(11)    In December of 2005, the Bank conducted its own internal investigation regarding the validity of the Ratification;

(12)    In May and June of 2006, the Bank attended meetings with Hoskins's attorney outlining all of his claims regarding the Baker Lease; and

(13)    Even after filing suit, the Bank continued to accept royalty payments totaling over $500,000.00.

Appellees argue the Bank's subjective belief regarding the credibility or effect of those facts cannot defeat ratification.

*3.      Analysis*

In *Prize I*, this court concluded that, prior to signing the Ratification, the Bank was not aware the Baker Lease had expired in August of 2001. *Prize I*, 345 S.W.3d at 577. This court further concluded the summary judgment evidence raised questions of fact regarding Appellees' false representations and the Bank's reliance on Appellees' misrepresentations in signing the Ratification. *Id*. at 584–85. Although Appellees now point to information supporting the Bank's knowledge of the alleged fraud and its decision to continue accepting the benefits, the evidence raises the same questions of fact reviewed by this court in *Prize I*.

Appellees' summary judgment evidence does not change this court's previous conclusion regarding Appellees' misrepresentations. *Id*. at 584–85. "[T]here is summary judgment evidence raising a fact issue that [Appellees] concealed that the Lease had terminated, both for cessation of production and for failure to produce in paying quantities." *Id*. at 585. For the same reasons, we now conclude the summary judgment evidence raises genuine issues of material fact regarding the Bank's actual knowledge of the fraud.

Appellees contend that even if the Bank was fraudulently induced into signing the Ratification, the Bank's actions ratified the contract and barred the Bank's claims for rescission

and damages. *See Fortune Prod.*, 52 S.W.3d at 677–78. We, therefore, turn to the Bank's actions after it signed the Ratification.

**D.      Waiver Based on the Bank's Actions After Signing the Ratification**

The Texas Supreme Court's analysis in *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d at 680, is instructive.[3] *Fortune Production* involved, predominantly, three plaintiffs—Fortune, Tucker, and Hankamer, all natural gas producers. *Id.* at 673. Conoco told the plaintiffs that it would not resell their residue gas at a lucrative contract price of $3.50 per Mcf. *Id.* at 674. The plaintiffs were led to believe their residue gas "would and could only be sold" on the spot market, at a substantially lower price. *Id.* Relying on Conoco's representations, the plaintiffs signed two-year contracts with Conoco, effective from 1990 to 1992, in which they agreed to accept a price based on spot market prices for residue gas. *Id.* Although Hankamer declined Conoco's offers, he continued to deliver gas to Conoco and to accept payment for residue gas based on spot market prices. *Id.* at 674. At some point in time, the plaintiffs learned that most of their residue gas had been resold by Conoco to Lone Star and that Conoco had received $3.50 Mcf for that gas. *Id.* at 675. "Precisely when plaintiffs learned these facts was disputed at trial." *Id.*

The Supreme Court looked at several criteria in addressing the question of intent as to the plaintiffs' attempt to avoid the contract. Initially, the court analyzed the claims based on whether each plaintiff had a continuing obligation to perform and whether each plaintiff was bound by contract. *Id.*

---

[3] Appellees rely on *Spellman v. Am. Universal Inv. Co.*, 687 S.W.2d 27, 29 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.), *criticized by Fortune Prod.*, 52 S.W.3d at 678, for the proposition that a contract can be ratified even in the face of a party urging the ratification continuing to "deny wrongdoing." *Spellman*, however, was expressly disapproved of in *Fortune Production*. 52 S.W.3d at 678.

### 1. *Continuing Obligation to Perform*

A party who does not have a continuing obligation to perform under a contract, but who nevertheless continues to perform after learning of a fraud, ratifies the fraud. *Id*. at 679. Because the party had an obligation to perform, knew of the fraud, and continued to perform, the party is precluded from recovering damages for performance after it knew of the fraud. *Id.*; *see also Meyer v. Cathey*, 167 S.W.3d 327, 331–32 (Tex. 2005) (concluding that because Cathey was aware of the alleged fraud, but continued to work with Meyer despite being under no obligation to do so, Cathey ratified any fraud arising from misrepresentations made in the earlier agreement). Yet, "[n]ot every ratification of a contract induced by fraud will waive the right to sue for damages, as distinguished from the right to rescind." *Fortune Prod.*, 52 S.W.3d at 678.

> [A]cts done in affirmance of the contract can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts, and with the intention, clearly manifested, of abiding by the contract and waiving all right to recover for the deception. Acts which, although in affirmance of the contract, do not indicate any intention to waive the fraud, cannot be held to operate as a waiver.

*Id*. at 677 (quoting *Kennedy*, 135 S.W. at 525) (internal quotation marks omitted).

### 2. *Existence of Contract Binding a Party*

The court next looked to whether a contract bound the plaintiff to continue performance. *Id*. at 679. Although Fortune and Tucker continued to deliver their gas to Conoco and accept payment after they learned of the fraud, their continued performance did not foreclose their right to sue for damages. *Id.* at 679–80. However, because Hankamer did not have a written agreement with Conoco after his contract expired, Hankamer was under no obligation to sell and Conoco was not required to purchase. "When [Hankamer's company] delivered its gas after they knew of Conoco's fraud, with no obligation to continue deliveries, they were no longer relying on misrepresentations." *Id.* at 679. "By delivering gas when they had no continuing obligation to do

so after they learned that Conoco had made misrepresentations, [Hankamer's company] entered into a new series of agreements with full knowledge of all material facts and of the prices that they were accepting." *Id.* at 680.

> 3.      *Present Contract was Binding on the Bank*

The Bank contends, unlike Hankamer, it was bound by the division orders because it accepted the royalty payments based on the unit percentages under the division orders, and it had not revoked the division orders. *Id*. at 679. As such, even if the Bank continued to accept payments after it discovered the fraud, such acceptance does not foreclose their right to sue for damages. *Id.* at 679–80. We agree.

Like Fortune and Tucker, after discovering the fraud, the Bank *could* have refused to perform under the fraudulently-induced contracts. *Id*. at 680. Yet, based on its obligation under the division orders, we cannot conclude Appellees conclusively proved the Bank's conduct evidenced an intention to waive the fraud or to ratify the Ratification. *Id*. Accordingly, under *Fortune Production*, the Bank's decision to continue performance did not operate, as a matter of law, as a waiver or "result in a loss of the right to sue for damages." *Id*. at 679.

**E.    Analysis**

The summary judgment evidence raises genuine issues of material fact as to the extent and timing of the Bank's actual knowledge of the fraud. *See K.B.*, 811 S.W.2d at 638; *see also Thompson Oil*, 351 S.W.3d at 165–66. Appellees' arguments only highlight the facts in question—including the documents and agreements signed, as well as the misrepresentations made by Appellees. Summary judgment is not proper based on the Bank having knowledge of some facts. Summary judgment would be proper only if Appellees conclusively proved the Bank possessed actual knowledge of all the material facts. *Id*. at 166.

Appellees' summary judgment evidence also fails to prove the Bank acted with the requisite intent to waive the fraud. *Fortune Prod.*, 52 S.W.3d at 677–78 (concluding question of ratification waiving fraud is not a black and white issue); *see also Jernigan*, 111 S.W.3d at 156 (reiterating waiver includes element of intent). Based on the "surrounding facts and circumstances," the summary judgment evidence is insufficient to support the trial court's determination that Appellees conclusively proved the Bank acted with the requisite intent to waive its claim of fraud. *Jernigan*, 111 S.W.3d at 156. Although there is no question the Bank accepted royalties and monies for several years, ratification is an affirmative defense and a party asserting the defense must prove each element. *K.B.*, 811 S.W.2d at 638. Appellees' summary judgment evidence does not prove, as a matter of law, the Bank intended to ratify any new agreement.

Considering all the evidence in the light most favorable to the Bank, *Goodyear Tire*, 236 S.W.3d at 756, we conclude Appellees failed to establish that, as a matter of law, the Bank possessed "full knowledge of the fraud and all of the material facts'" *Fortune Prod.*, 52 S.W.3d at 677 (quoting *Kennedy*, 135 S.W.at 525), and that the Bank intended to waive any such fraud. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548. Accordingly, the trial court's grant of summary judgment on these issues was in error.[4]

We next turn to the trial court's determination that the doctrine of quasi-estoppel prevented the Bank from seeking rescission.

### QUASI-ESTOPPEL AFFIRMATIVE DEFENSE

Appellees contend the Bank is estopped from asserting the Baker Lease terminated in August 2001 and that its mineral estate automatically reverted at that time. Appellees argue that

---

[4] Appellees argue entitlement to summary judgment on the Bank's claims for exemplary damages, corporate veil piercing, and attorneys' fees. Because we conclude material questions of fact precluded the grant of summary judgment, we need not address these issues. *See* TEX. R. APP. P. 47.1.

because the Bank's actions, after it had full knowledge of the material facts, were inconsistent with seeking to rescind the Ratification, it would be unconscionable to allow the Bank to now rescind.

### 1. *Affirmative Defense of Quasi-Estoppel*

Quasi-estoppel is an affirmative defense that "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). Although similar to equitable estoppel, quasi-estoppel does not require "proof of a false statement or detrimental reliance." *Cambridge Prod., Inc. v. Geodyne Nominee Corp.*, 292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet. denied); *accord Fasken Land & Minerals, Ltd. v. Occidental Permian, Ltd.*, 225 S.W.3d 577, 593 (Tex. App.—El Paso 2005, pet. denied).

Quasi-estoppel "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez*, 22 S.W.3d at 864; *see also Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 268 (Tex. App.—Dallas 2011, pet. denied); *Hamilton v. Morris Res., Ltd.*, 225 S.W.3d 336, 346 (Tex. App.—San Antonio 2007, pet. denied); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied) ("[Q]uasi estoppel forbids a party from accepting the benefits of a transaction . . . and then subsequently taking an inconsistent position to avoid corresponding obligations or effects."). To prevail on a claim for quasi-estoppel, Appellees must prove (1) the Bank acquiesced to or benefited from a position inconsistent with its present position, (2) it would be unconscionable to allow the Bank to assert rescission, and (3) the Bank had knowledge of all material facts at the time of the conduct on which estoppel is based. *Lopez*, 22 S.W.3d at 864; *accord In re Willa Peters Hubberd Testamentary Trust*, 432 S.W.3d 358, 368 (Tex. App.—San Antonio 2014, no pet.).

As an equitable theory, estoppel is subject to traditional equitable defenses. *Tex. Enters., Inc. v. Arnold Oil Co.*, 59 S.W.3d 244, 249 (Tex. App.—San Antonio 2001, no pet.). The defensive doctrine of "clean hands" requires that one who comes to court seeking equity must come with clean hands. *Id.*; *see Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988); *Pickett v. Heygood, Orr & Reyes, L.L.P.*, No. 05-07-00079-CV, 2008 WL 2266133, at *5 (Tex. App.—Dallas Jun. 4, 2008, no pet.) (mem. op.) (applying unclean hands to quasi-estoppel).

### 2. Arguments by the Parties

Appellees argue the Bank accepted significant sums of money via royalty checks after signing the Ratification. Specifically, Appellees assert that royalties are not payments to which the Bank was entitled as an unleased co-tenant (as opposed to payments to working interest owners which are subject to costs of development). To the contrary, royalties are cost-free and are the creation of a mineral lease. Thus, the Bank's acceptance of the royalty payments can only be consistent with continued validity of the Baker Lease through the operation of the Ratification.

The Bank contends it was not estopped from claiming that the Baker Lease terminated because it accepted royalties attributable to that lease and the Ratification.

### 3. Analysis

In *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d at 240, the court looked at Albrecht's conduct in accepting royalty payments. Albrecht accepted royalty payments after he made clear to Atkinson Gas that he considered the lease to have been terminated due to cessation of production. *Id.* "The present single instance of accepting a royalty payment a portion of which [Albrecht] was not entitled to, was not sufficient to show that Albrecht had abandoned this position and would be estopped from reasserting it." *Id.*; *see also Fields v. Waterfield*, No. 07-04-0118-CV, 2006 WL 176445, at *5 (Tex. App.—Amarillo Jan. 25, 2006, judg. withdrawn) (mem. op.) (holding acceptance of royalty payments, to which they were entitled, did not prove estoppel); *Ladd Petrol.*

*Corp. v. Eagle Oil & Gas Co.*, 695 S.W.2d 99, 109 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.) ("[T]he mere continuance of the acceptance of royalties would not estop the [lessors] from challenging the lease."). Although quasi-estoppel prevents a party from accepting the benefits of a contract and subsequently taking a position inconsistent to the contract, there must be a showing that the acceptance of royalty payments did not support an intent to relieve the gas company of their obligation. *Atkinson Gas Co.*, 878 S.W.2d at 240.

The Bank's acceptance of royalty payments *after its notification* to Appellees that it considered the lease terminated does not, without more, create an estoppel of its consistently held position that the Baker Lease terminated in August of 2001. *Id.*; *Fields*, 2006 WL 176445, at *5; *Ladd Petrol. Corp.*, 695 S.W.2d at 109; *cf. Little v. Delta Steel, Inc.*, 409 S.W.3d 704, 715 (Tex. App.—Fort Worth 2013, no pet.) (holding the plaintiff's acceptance of worker's compensation benefits for over two years was inconsistent and allowing her to assert negligence claim was unconscionable). The summary judgment evidence does not conclusively prove Appellees' contention—that allowing the Bank to now disavow the Ratification would unfairly disadvantage Appellees and be unconscionable. Appellees' summary judgment evidence fails to prove, as a matter of law, the Bank was estopped from asserting the Baker Lease terminated in August 2001 and that its mineral estate automatically reverted to the Bank at that time. *Lopez*, 22 S.W.3d at 864; *Atkinson Gas Co.*, 878 S.W.2d at 240.

To the contrary, as we previously outlined, the evidence raises genuine issues of material fact whether the Bank's actions were inconsistent with its attempt to rescind the Ratification—including whether, to effect rescission, the Bank was "ready and willing to" tender any benefits to which it was entitled. *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 836 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *Wilson v. Klein*, 715 S.W.2d 814, 822 (Tex. App.—Austin 1986, writ ref'd n.r.e.). Furthermore, in light of this court's opinion in *Prize I*, we cannot conclude, that

- 20 -

as a matter of law, Appellees came to the table with clean hands and are entitled to raise the equitable defense of quasi-estoppel.

## ADVERSE POSSESSION

Appellees assert they acquired the leasehold interest in the Baker Lease by operation of the three-year period of adverse possession. As such, Appellees contend the Bank cannot succeed because Appellees have adversely possessed the leasehold interest in the Baker Lease by continuing to develop the lease and pay royalties to the Bank. TEX. CIV. PRAC. & REM. CODE ANN. § 16.024 (West 2002) ("A person must bring suit to recover real property held by another in peaceable and adverse possession under title or color of title not later than three years after the day the cause of action accrues."). Specifically, Appellees point to their continued development of the property, the drilling of new wells, the production of oil and gas, and the royalties paid to the Bank under the Baker Lease. Accordingly, because the Bank did not file suit until after the three-year period expired, Appellees claim they acquired the leasehold interest, and the Bank's claims based on lack of a valid lease fail.

### 1.    Requirements to Prove Adverse Possession

Adverse possession requires possession "under title or color of title." *Id*.; *Wilhoite v. Sims*, 401 S.W.3d 752, 757 (Tex. App.—Dallas 2013, no pet.). The Bank contends Appellees neither claim nor prove color of title. "'Color of title' means a consecutive chain of transfers to the person in possession that . . . is not regular because of a muniment that is not properly recorded or is only in writing or because of a similar defect that does not want of intrinsic fairness or honesty. . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 16.021(2). The statute also requires that the possession be "inconsistent with and . . . hostile to the claim of another person." *Id*. § 16.021(1). The "'possession must be of such character as to indicate *unmistakably* an assertion of a claim of *exclusive* ownership in the occupant.'" *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990)

- 21 -

(quoting *Rick v. Grubbs*, 214 S.W.2d 925, 927 (Tex. 1948); *McDonnold v. Weinacht*, 465 S.W.2d 136, 141 (Tex. 1971)).

"Fraudulent concealment is based upon the doctrine of equitable estoppel . . . [and] estops a defendant from relying on the statute of limitations as an affirmative defense to plaintiff's claim." *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983). Fraudulent concealment tolls the statute of limitations until the plaintiff, "using reasonable diligence, discovered or should have discovered the injury." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999); *accord Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex. 1997). Equity tolls the statute of limitations because of "the defendant's active suppression of the truth or failure to disclose when the defendant is under a duty to disclose." *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 439 (Tex. App.—Fort Worth 1997, pet. denied).

2.    *Analysis*

Under the Baker Lease, the lessees held a fee simple determinable interest subject to the Bank's possibility of reverter. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). When the production ceased for a period exceeding sixty-days, the Baker Lease terminated and the Bank's 25% mineral interest automatically reverted to the Bank. *See Prize I*, 345 S.W.3d at 584–85. By virtue of the lease terminating, and the Bank's mineral interest reverting, the Bank and the Rutherfords were unleased co-tenants. The Baker Lease does not provide, and Appellees have not provided any other evidence, that upon termination of the Baker Lease, the Rutherfords, or any other party, held the Bank's 25% mineral interest under title or color of title. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.021(2) (explaining color of title requires a consecutive chain of transfers); *Wilhoite*, 401 S.W.3d at 757.

Based on the summary judgment evidence, we cannot conclude Appellees proved, as a matter of law, they possessed title or color of title to the leasehold in question. TEX. R. CIV. P.

166a(c); *Nixon*, 690 S.W.2d at 548. Additionally, the evidence raises genuine issues of material fact regarding whether Appellees' affirmative acts to prevent the Bank's discovery of the lease termination tolled the statute of limitations. *See Mitchell Energy Corp.*, 958 S.W.2d at 439. Accordingly, the trial court erred in granting summary judgment on this issue.

### SUMMARY JUDGMENT ON THE BANK'S REMAINING CLAIMS

Appellees contend that because the Bank's response to the traditional motion for summary judgment did not address the remaining grounds for summary judgment, they cannot challenge the holding on appeal. Appellees also argue that with regard to its no-evidence summary judgment, the Bank failed to produce any new evidence and the previous evidence is insufficient to create a fact issue. We address each issue independently.

*1.      Unjust Enrichment*

Appellees argue the Bank's fraudulent inducement claim is an unjust enrichment claim that is barred because an express contract governs the subject matter of the dispute. *Fortune Prod.*, 52 S.W.3d at 684. The Bank counters Appellees were unjustly enriched by paying only royalties under the Baker Lease instead of a share of production to which the Bank is entitled because the lease terminated. Here, Appellees contend, the subject matter of the dispute is the 25% mineral interest and entitlement to share of proceeds from production.

The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution. *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas), *aff'd* 168 S.W.3d 917 (Tex. 2005). "The doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.*

Unjust enrichment is characterized by a party failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract. *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.); *TransAm. Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied) (en banc). The Bank contends there was no express contract because the Baker Lease terminated in August 2001 and the Ratification was induced by fraud. Moreover, assuming unjust enrichment, the Bank contends it is entitled to an accounting to determine the amount of the unjust enrichment and that is a question of fact that alone would bar summary judgment.

As to the no-evidence summary judgment, Appellees contend the Bank presented no evidence they retained a benefit to the Bank's detriment. Because there is evidence that the Ratification was procured by fraud, there is a question of whether it is enforceable. The Bank's original 25% mineral interest reverted to the Bank in August of 2001 when the Baker Lease terminated. As such, the Bank contends it is a co-tenant with the Rutherfords and entitled to its proportionate share of any production from the leasehold. For the same reasons we concluded the summary judgment evidence raises a fact question as to the Ratification, there are genuine issues of material fact pertaining to the Bank's unjust enrichment claim.

*2.    Conversion*

Conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); *accord Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g). To establish conversion of personal property, a plaintiff must prove (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; "(2) the defendant unlawfully and without authorization assumed and exercised control

over the property to the exclusion of, or inconsistent with, the plaintiff's rights"; (3) the plaintiff made a demand for the property; and "(4) the defendant refused to return the property." *Tex. Integrated Conveyor Sys., Inc.*, 300 S.W.3d at 365–66.

We agree with the Bank's contentions that because Appellees' argument is based on the Ratification, which was allegedly induced by fraud, the questions of fact raised earlier apply to this issue as well. Appellees acknowledge they have paid the Bank only a fraction of the royalty, even after the termination of the Baker Lease. The retention of the monies owed to the Bank raises a plethora of questions regarding whether such exercise of dominion and control over the Bank's property constitutes conversion. *Id.* Accordingly, the trial court erred in granting summary judgment on the issue of conversion.

### 3. *Texas Natural Resources Code*

Appellees contend they are entitled to summary judgment on the Bank's claims with regard to any violation by Appellees of the Texas Natural Resources Code. The Bank counters the argument is immaterial because the Bank's claim is that Appellees have not timely paid the new revenues to which the Bank is entitled as co-tenant.

Citing section 91.402(b) of the Texas Natural Resource Code, Appellees argue that the Bank has not produced any evidence that Appellees were not entitled to withhold payments. TEX. NAT. RES. CODE ANN. § 91.042 (West 2011) (outlining when payments may be withheld for proceeds derived from the sale of oil or gas production from an oil or gas well). Therefore, if the Ratification is enforceable, then the Bank is entitled only to the royalty payments it has already received. Appellees base this theory of recovery on the trial court's determination on the Bank's claims seeking to rescind the Ratification. Once again, this becomes a circular argument. Because we previously concluded genuine issues of material fact exist as to the Ratification, there are also genuine issues of material fact as to violations of the Texas Natural Resource Code. Accordingly,

the trial court erred in granting summary judgment as to the Bank's claims under the Texas Natural Resource Code.

## CONCLUSION

Having reviewed the evidence, we conclude the summary judgment evidence raises genuine issues of material fact on each of Appellees' theories, and the trial court erred by granting Appellees' motion. *See* TEX. R. CIV. P. 166a(c),(i); *Nixon*, 690 S.W.2d at 548; *Romo v. Tex. Dep't of Transp.*, 48 S.W.3d 265, 269 (Tex. App.—San Antonio 2001, no pet.). Accordingly, we reverse the trial court's grant of traditional and no-evidence summary judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

Patricia O. Alvarez, Justice