

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-24-00387-CV

Soledad **MORENO**,
Appellant

v.

Karen **TIDWELL**, Individually and as Independent Executor of the Estates of Robert L. Gibson
Jr. and Mary Lou Gibson and Sharon Snow, Individually and as Independent Executor of the
Estates of Robert L. Gibson Jr. and Mary Lou Gibson,
Appellees

From the 38th Judicial District Court, Uvalde County, Texas
Trial Court No. 2022-02-34218-CV
Judge Sandee Bryan Marion, Judge Presiding

Opinion by:　Adrian A. Spears II, Justice

Sitting:　　Irene Rios, Justice
　　　　　Lori Massey Brissette, Justice
　　　　　Adrian A. Spears II, Justice

Delivered and Filed: February 25, 2026

AFFIRMED

In the underlying proceeding, Soledad Moreno brought a wrongful foreclosure action and

other claims against Karen Tidwell and Sharon Snow, individually and in their capacities as co-

independent executors of the Estates of Robert L. Gibson Jr. and Mary Lou Gibson. Tidwell and

Snow denied all allegations and counterclaimed for an order to award them possession of the

premises and evict Moreno. After a bench trial, the trial court rendered judgment in favor of

Tidwell and Snow for title and possession of the property, ordering that they "shall have all writs of possession necessary to enforce th[e] judgment." The trial court also rendered judgment in Tidwell and Snow's favor on all of Moreno's claims and ordered that Moreno shall take nothing against them. On appeal, Moreno attacks the sufficiency of the evidence to support the trial court's findings of fact and argues that the trial court's conclusions of law were erroneous. We affirm.

BACKGROUND

On October 20, 2015, Robert L. Gibson Jr. and Mary Lou Gibson entered into a contract to sell real property ("the Property") to Moreno with seller financing. The settlement statement reflected a sales price of $85,000, with a $5,000 down payment, and owner-financing in the amount of $80,000. The settlement statement shows that a pro rata amount of $1344.89 for the 2015 property taxes (i.e., from January 2015 to the date of sale) was credited to Moreno. Thus, Moreno was credited for the amount of property taxes owed by the sellers in 2015. The promissory note, also dated October 20, 2015, reflected that Moreno was the borrower and the Gibsons were the lenders. The amount financed was $80,000 with a four percent annual interest rate. The maturity date was October 1, 2030. Monthly payments were $591.75, beginning on Nov. 1, 2015, and due on the first day of each month thereafter. The promissory note was secured with a vendor's lien and superior title retained by the Gibsons. The Warranty Deed with Vendor's Lien, also dated October 20, 2015, stated that the consideration was *cash* (i.e., the down payment) and "a note of even date executed by Grantee and payable to the order of Grantor in the principal amount of EIGHTY THOUSAND AND NO/100 DOLLARS ($80,000.00)." The warranty deed also provided that Grantee (Moreno) assumed and agreed to pay the 2015 property taxes and those thereafter. The Deed of Trust provided that Moreno was the Grantor and Mickey Gerdes, the

attorney who prepared the documents, was the Trustee. It conveyed the Property to the trustee in trust and required Moreno to pay the property taxes.

At trial, Karen Tidwell testified that she and her sister, Sharon Snow, owned the Property through their mother's and father's estates. Tidwell explained that she had helped her parents with the ledgers and payments for the Property, and that in September 2016, she completely took over the ledgers when her mother died and her father was residing in a nursing home. She testified that Moreno entered into an agreement with her parents to purchase the Property for $85,000 with $5,000 down. Tidwell's testimony is consistent with the settlement statement signed by Moreno. Tidwell testified that Moreno was consistently behind in her payments and never paid ahead. According to Tidwell, in 2015, Moreno would fall behind on her monthly payments, would catch up, and then would fall behind again. The main problem was that she did not pay the 2015 property taxes as required. Tidwell testified that her father paid the 2015 property taxes on January 28, 2017, and that the money for the 2015 property taxes did not come from Moreno. A receipt for the 2015 taxes, which was admitted in evidence, shows that the 2015 taxes were paid for by R.L. Gibson Jr., Tidwell's father. Tidwell testified that Moreno was then charged for the taxes plus penalties/interest.

On November 2, 2016, Trustee Mickey Gerdes sent, by certified mail, a notice of default and intent to accelerate to Moreno. In the certified letter, Moreno was informed that she had a period of not less than twenty days to cure the default before the entire debt secured by the deed of trust became due. Notice of the foreclosure sale was also given. Despite two different attempts at delivering the certified mail, it was returned.

On March 7, 2017, Tidwell and Snow bought the Property at the foreclosure sale. Three days later, on March 10, 2017, Tidwell and Snow changed the locks on the doors of the Property.

Tidwell later received a phone call from Moreno who was upset at having been locked out of the Property. Tidwell went to the Property to discuss the matter with Moreno. Tidwell testified that Moreno was upset and did not want to leave the Property. Tidwell testified that during this conversation, she told Moreno about the foreclosure sale. Tidwell and Snow told Moreno that they would "work with her" and allow her to rent the Property until she could pay back the taxes she owed them and could secure third-party financing to purchase the home again from them. Tidwell testified that they told Moreno she could buy the house from them again for $75,000. According to Tidwell, the conversation lasted no more than fifteen minutes.

Moreno's attorney confronted Tidwell with her prior deposition testimony where Tidwell was asked whether Moreno had any equity in the Property in June 2022. In her deposition, Tidwell had replied in the affirmative. When confronted with this prior testimony, Tidwell testified that she must have been confused during her deposition as to the time period about which she was being asked, because after the foreclosure sale, Moreno no longer had any equity in the Property. At various times during her testimony, Tidwell appeared to be confused about the time period related to Moreno's attorney's queries. Tidwell finally told Moreno's attorney, "You skipping around all these years confuses me."

Nonetheless, Tidwell was clear at trial that after the foreclosure sale on March 10, 2017, she and Snow had a conversation with Moreno and informed Moreno that she was merely a tenant. Tidwell testified that they never signed a lease, but Moreno had permission to stay in the Property because she agreed with the rental plan until she could obtain third-party financing to purchase the Property again from Tidwell and Snow. Tidwell testified, "We offered her an opportunity to buy the house, and she said that she was having trouble getting financing, and we told her that she could rent until she could get things processed and things taken care of as long as she kept the rent

paid up and the $300 a month [payment for] the back taxes." Tidwell was clear in her testimony that after the foreclosure sale, she and Snow offered to sell the Property again to Moreno for $75,000 and that Moreno agreed but never proceeded with obtaining financing or signing documents.

Tidwell testified that on June 30, 2017, Moreno paid them in part for the 2015 and 2016 back taxes. Because Moreno had not paid the 2015 and 2016 taxes when they were due, penalties were charged until the eventual late payment made by Gibson. Thus, while Moreno paid the original amount of the 2015 and 2016 property taxes, the actual amount charged with penalties was not paid by Moreno until 2018.

On November 17, 2017, and again on December 1, 2017, Tidwell and Snow sent the same letter to Moreno about the money still owed to them. The letter discussed Moreno either renting the Property or purchasing the home from them again so long as Moreno paid back the 2016 property taxes still owed to them. Tidwell testified that she both mailed the letters and taped copies of the letters on the front and back doors of the Property. Tidwell testified that taping copies of the letters she sent to Moreno on both the front and back doors of the Property was her practice. On November 28, 2018, Tidwell mailed another letter by certified mail, informing Moreno that she needed to vacate the home in thirty days because of nonpayment of rent and back taxes for 2016 still owed: "Due to nonpayment of rent and back taxes, as was our agreement, on the [Property], we are asking you to vacate the property. If you are not out within thirty days or sooner, we will pursue all legal options available to us." On September 30, 2020, Tidwell and Snow sent Moreno a letter stating that they "wish[ed] to continue with the sale of the [Property]." They stated, "Last year we offered you [the] first opportunity to buy it for $75,000.00, and we want you to know the offer still stands, even though the County Appraisal District shows a value of $89,373.00." In a

letter dated December 26, 2020, Tidwell and Snow informed Moreno that her "December rent [was] now 26 days past due" and that Moreno had "been 15 days or more behind on paying [her] rent for several months." They reiterated that Moreno's payments were due on the first day of each month. They stated that they wanted to meet with Moreno to discuss the Property, stating that they had "offered it to [Moreno] for $75,000.00 even though it is appraised at [the] county tax office for over $89,000.00."

Tidwell testified that Moreno never claimed that she still owned the Property. She never claimed she was not a renter, and she was unresponsive to their multiple attempts to communicate with her. According to Tidwell, she sent Moreno emails and text messages and would never receive a response. Tidwell testified that she could not believe Moreno never knew about all the letters because Tidwell would "tape them inside the screen door on both the front and back" of the Property. Tidwell testified that she and Snow filed the eviction suit against Moreno in 2021.

Tidwell's sister, Snow, testified that she and Tidwell were co-executors for their parents' estates. According to Snow, her mother involved her and Tidwell in the ledgers regarding the Property from the beginning. When her mother passed away, Snow and Tidwell became even more involved. Snow testified that her mother had started the foreclosure proceedings on the Property before she passed away. The reason for the foreclosure proceedings was because Moreno had not fulfilled her obligation to pay the property taxes. Like Tidwell, Snow testified that while Moreno made a payment toward the 2015 and 2016 taxes on June 30, 2017, Moreno had not paid the full amount owed because of the penalties added for the payment having been made late.

After her mother passed away, Snow and Tidwell met with the trustee, Gerdes, who informed them that he was sending out a foreclosure notice to Moreno. Snow confirmed that she and Tidwell posted all the letters on the doors of the Property so that Moreno would see them. Like

Tidwell, Snow testified that on March 10, 2017, she and Tidwell went to the Property because Moreno had called and was upset at having been locked out of the Property. Snow testified that she and Tidwell informed Moreno that if Moreno wanted to stay in the Property, Moreno had to either rent it or obtain financing from a third-party to buy the Property again from them. According to Snow, Moreno stated that she would go find third-party financing but then stopped communicating with them. Snow testified that she and Tidwell told Moreno she could stay in the Property if she rented it and paid an extra $300 fee for the back taxes owed. Snow testified that it was a verbal agreement because she and Tidwell had not brought documentation that night and then Moreno stopped communicating with them. Moreno made the rent payments without speaking to them or seeing them in person. Snow testified the verbal agreement "just continued on and on." Snow testified that she and Tidwell believed it would only be about six months before Moreno would obtain the third-party financing to purchase the Property again. Snow testified that at the time she and Tidwell filed the eviction suit, Moreno was behind in her rental payments.

During her testimony, Moreno told a completely different sequence of events from those testified to by Tidwell and Snow. Moreno testified she thought the original price for the Property was $80,000.00, because the promissory note stated $80,000.00. When asked what she believed her $5,000.00 down payment was credited to, Moreno testified that she thought the $5,000.00 down payment was for the purpose of paying the property taxes. Thus, she testified she did pay the 2015 property taxes with the down payment at closing. Moreno's belief is not consistent with the closing documents she signed when she purchased the Property. When she was shown the settlement statement, which reflected that she was credited for the pro rata amount of the seller's property tax liability, Moreno testified that she did not understand that she was supposed to pay the 2015 property taxes herself. She testified that she made the monthly payments pursuant to the

promissory note in 2015 and 2016. She admitted that she did not submit any extra payments to the Gibsons for the purpose of paying the property taxes. It is clear from Moreno's testimony that she believed by making monthly payments under the promissory note, she would not be in breach; however, it is also clear that Moreno did not make the 2015 and 2016 tax payments as required by the closing documents.

Moreno testified that on June 30, 2017, she gave Tidwell and Snow a check for $3,077.28 as they requested. Moreno claimed that she never received any notice of the foreclosure sale or the acceleration of the note, and was completely surprised by the eviction suit. She was asked why she did not clue into something having happened when she was locked out of the Property in March 2017. She responded that it was late, and when Tidwell showed up, she just told Tidwell that she needed a key to the Property. Moreno testified that she never received any letters from Tidwell and Snow, never got the November 2, 2017 letter, never saw any letters posted on the back and front doors of the Property, and never received any letters in the mail.

On February 25, 2022, Moreno sued Tidwell and Snow for the following causes of action: DTPA, Fraud, Fraud in a Real Estate Transaction, Negligent Misrepresentation, Breach of Contract, Texas Uniform Fraudulent Transfer Act, Civil Conspiracy, Affirmative Defenses of ratification, waiver, mistake, novation, modification, unclean hands, no loss or damage, defendant breached contract first, and laches. On October 25, 2022, Moreno filed an amended petition adding claims for Negligence, Abuse of Process, Malicious Prosecution, Tortious Interference with Contract, Money Had and Received, Fraud by Nondisclosure, Theft Liability Act, Trespass to Try Title, Unfair Debt Collection, Wrongful Disclosure, Breach of Executory Contract, Quiet Title, Promissory Estoppel, and declaratory judgment. Tidwell and Snow filed an answer raising the statute of limitations, the statute of frauds, no conditions precedent, no tender of claim before

filing, and brought a counterclaim to award them possession of the Property and order Moreno to vacate.[1]

After the bench trial, the trial court made the following findings of fact:

1.  Moreno "was properly served via certified mail on November 2, 2016, with notice that she was in default of the promissory note dated October 20, 2015, executed by Soledad Moreno, a single person and payable to the order of Robert L. Gibson, Jr."

2.  Moreno "was properly served via certified mail on February 13, 2017, with a true and current copy of the notice of foreclosure sale of the Real Property."

3.  "No defect occurred in the foreclosure sale proceedings resulting in the Foreclosure Sale Deed dated March 7, 2017, recorded under Document No. 2017000673 of the Official Public Records of Uvalde County, Texas ('Foreclosure Deed')."

4.  "The Foreclosure Deed is a valid deed."

5.  Tidwell and Snow "in their individual capacities are the sole owners of the Real Property."

6.  Moreno "has not held an ownership interest in the Real Property since March 7, 2017."

7.  Tidwell and Snow "did not enter into an agreement with" Moreno for Moreno "to purchase the Real Property after March 7, 2017."

8.  "The lease agreement between" Moreno and Tidwell and Snow "terminated no later than November 10, 2021 due to the failure of" Moreno "to make the required lease payments."

9.  There were "no unconscionable or deceptive trade practices by" Tidwell and Snow.

10. There was "no fraudulent concealment or failure to disclose by" Tidwell and Snow.

11. Tidwell and Snow "did not make a false representation of material fact to" Moreno "regarding the Real Property."

12. There was "no breach of duty by" Tidwell and Snow.

---

[1]Their prior eviction suit was subsumed into this case.

13. Tidwell and Snow "did not breach any contract between" Moreno and Tidwell and Snow.

14. Tidwell and Snow "did not have a meeting of minds to accomplish an unlawful act."

15. There was "no illegal, improper, or perverted use of process."

16. There was "no institution or continuation of a civil proceeding against" Moreno "with malice."

17. There was "no institution or continuation of a civil proceeding against" Moreno "with lack of probable cause for the proceeding."

18. There was "no tortious interference with a contract by" Tidwell and Snow.

19. Tidwell and Snow "do not and have not taken money belonging to" Moreno "in equity or good conscious."

20. There was "no unlawful appropriation or taking of [Moreno]'s property or services."

21. There was "no use of an unfair debt collection practice by" Tidwell and Snow.

22. Tidwell and Snow "did not represent to [Moreno] that the terms of the October 20, 2015, contract were in full force and effect at any time after March 7, 2017."

23. Moreno "presented no evidence of ratification, waiver, mistake, novation, modification, unclean hands, laches, equitable estoppel, interdependent and concerted misconduct estoppel, direct-benefit estoppel, substantial-benefit estoppel, or quasi-estoppel."

24. Moreno "pleaded for attorneys' fees. No evidence of attorneys' fees was adduced by" Moreno.

Based on these findings, the trial court concluded that the Foreclosure Deed was a "valid deed" and that Tidwell and Snow in their individual capacities are "the sole owners of the Real Property" and "hold full ownership and right to possession of the Real Property." The trial court further concluded that Moreno had not held "an ownership interest in the Real Property since March 7, 2017." Moreno appealed.

**FORECLOSURE SALE**

On appeal, Moreno attacks the trial court's conclusion that the March 7, 2017 foreclosure sale of the Property was valid. In doing so, Moreno argues that the evidence is legally and factually insufficient to support many of the trial court's findings of fact. First, Moreno argues that there was no evidence that she was presented with a notice of default. Moreno points to her testimony that she never received the notice and emphasizes that the only attempt to notify her was the November 2, 2016 letter, which was sent by certified mail and later returned. Moreno emphasizes that the Trustee's Affidavit by Gerdes states only that he sent a certified notice of default, which was returned to him undelivered. Tidwell and Snow respond that sending the notice by certified mail was sufficient notice.

*A. Standard of Review*

We review a trial court's findings of fact after a bench trial under the same standards applied to jury verdicts. *Bekins Van Lines, Inc. v. Kahn*, 717 S.W.3d 86, 94 (Tex. App.—Austin 2025, pet. denied); *Donias v. Old Am. Cnty. Mut. Fire Ins. Co.*, 649 S.W.3d 789, 793 (Tex. App.—El Paso 2022, no pet.). As the factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Bekins Van Lines*, 717 S.W.3d at 94; *Donias*, 649 S.W.3d at 793. The trial court is free to draw its own deductions from all the evidence and is not bound by the testimony of any witness. *Bekins Van Lines*, 717 S.W.3d at 94. Thus, "[w]e defer to the trial court's findings of fact—so long as they are supported by the record—and review conclusions of law de novo." *Id*. (quotation omitted).

When an appellant challenges *the legal sufficiency of an adverse finding on which she did not have the burden of proof at trial*, she must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Kazmi v.*

*Kazmi*, 693 S.W.3d 556, 566 (Tex. App.—Austin 2023, pet. denied); *Benavides v. Alexander*, 646 S.W.3d 14, 23 (Tex. App.—San Antonio 2021, pet. denied). "We will sustain a legal sufficiency challenge if 'the evidence offered to prove a vital fact is no more than a scintilla.'" *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009)). "In conducting our review, 'we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so.'" *Id*. (quoting *Akin, Gump*, 229 S.W.3d at 115). We may not second guess the factfinder unless only one inference may be drawn from the evidence. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex. 1991); *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 344 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then we must defer to the trial court and not substitute our own judgment for that of the factfinder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). "'It is the province of the jury to resolve conflicts in the evidence,' but the jury must do so reasonably." *McAllen Hosp., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (quoting *City of Keller*, 168 S.W.3d at 820, 827). "Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Id*. (quoting *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016)).

When an appellant challenges "*the legal sufficiency of an adverse finding on an issue on which she ha[d] the burden of proof [at trial]*, she must demonstrate on appeal that the evidence

establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (emphasis added). "In a 'matter of law' challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *NAC Tex Hotel Co., Inc. v. Greak*, 481 S.W.3d 327, 331 (Tex. App.—Tyler 2015, no pet.) (citing *Dow Chem.*, 46 S.W.3d at 241). "If there is no evidence to support the finding, we will examine the entire record in order to determine whether the contrary proposition is established as a matter of law." *Id.* (citing *Dow Chem.*, 46 S.W.3d at 241). The legal sufficiency challenge will be sustained only "if the contrary proposition is conclusively established." *Dow Chem.*, 46 S.W.3d at 241.

Factual sufficiency issues are designated either as "insufficient evidence" challenges or "great weight and preponderance" challenges, "depending upon whether the complaining party had the burden of proof." *Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied); *see* W. Wendell Hall & Ryan G. Anderson, *Standards of Review in Texas*, 50 ST. MARY'S L.J. 1099, 1134 (2019). When an appellant challenges *the factual sufficiency of an adverse finding on an issue the appellant did not have the burden of proof at trial*, she brings an "insufficient evidence" challenge and must demonstrate that the "evidence adduced to support the vital fact, even if it is the *only* evidence adduced on an issue, is factually too weak alone to support it." *Ritchey v. Crawford*, 734 S.W.2d 85, 87 n.1 (Tex. App.—Houston [1st Dist.] 1987, no writ) (emphasis in original). In reviewing this "insufficient evidence" challenge, we consider, weigh, and examine all the evidence that supports the finding and then consider all the evidence that is contrary to the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the finding only if the finding is so contrary to the

overwhelming weight of the evidence as to be clearly wrong and unjust. *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied).

When an appellant challenges *the factual sufficiency of an adverse finding on which she had the burden of proof at trial*, the appellant brings a "great weight and preponderance" issue and "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242. In reviewing this challenge, we "must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*.

We review conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

### B. *Written Notice of Default and Intent to Accelerate Under Section 51.002*

Moreno argues she did not receive written notice of default and intent to accelerate. Section 51.002 of the Texas Property Code provides the procedures for conducting a sale of real property pursuant to a deed of trust. *See* TEX. PROP. CODE § 51.002. Subsection (d) requires the lender to provide the debtor with "written notice by certified mail stating that the debtor is in default under the deed of trust or other contract lien and giving the debtor at least 20 days to cure the default before notice of [the foreclosure] sale can be given under Subsection (b)." *Id*. § 51.002(d). Subsection (e) provides that "[s]ervice of a notice under this section by certified mail is complete when the notice is deposited in the United States mail, postage prepaid and addressed to the debtor at the debtor's last known address." *Id*. § 51.002(e). "The affidavit of a person knowledgeable of the facts to the effect that service was completed is prima facie evidence of service." *Id*.

Here, the Foreclosure Deed was admitted into evidence without objection. It states the following in part:

> Written notice of default and of the opportunity to cure the default to avoid acceleration of the maturity of the note was served on behalf of the current Beneficiary by certified mail on each debtor who, according to the records of the current Beneficiary, is obligated to pay any of the Obligations. The certified-mail notice was timely sent by depositing the notice in the United States mail, postage prepaid in proper amount, and addressed to the debtor at the debtor's last known address as shown by the records of the current Beneficiary at least twenty days preceding the date of the acceleration of the maturity of the note and the posting of the mortgaged Property for foreclosure.

Also admitted in evidence without objection was the composite affidavit of the trustee, Gerdes, which was attached to the Foreclosure Deed ("Composite Affidavit"). In the Composite Affidavit, the trustee affirmed timely service of the notice of default and intent to accelerate was given to Moreno:

> On November 2, 2016, I notified Soledad Moreno, a single person, by certified mail that Soledad Moreno, a single person, had a period of not less than twenty days to cure the default before the entire debt secured by the deed of trust became due and notice of the proposed foreclosure sale was given.

The Foreclosure Deed and attached Composite Affidavit provided prima facie evidence of service. *See* TEX. PROP. CODE § 51.002(e) ("The affidavit of a person knowledgeable of the facts to the effect that service was completed is prima facie evidence of service.").

Moreno argues that the actual November 2, 2016 certified letter had to be admitted in evidence and that the trial court could not have determined the validity of the notice letter without it. However, there is no requirement that the actual notice of default be entered in evidence. We hold that the Foreclosure Deed and Composite Affidavit, which were admitted in evidence without objection, constitute prima facie evidence that the notice of default was sent in compliance with section 51.002(d).

Moreno further argues that she rebutted this prima facie evidence when she testified that she never received the certified letter in question. However, that Moreno did not receive the certified letter does not rebut the evidence that a notice was served in accordance with section 51.002. "Service of a notice [of trustee sale] by certified mail is complete when the notice is deposited in the United States mail, postage prepaid and addressed the debtor at the debtor's last known address as shown by the records of the holder of the debt." *Onwuteaka v. Cohen*, 846 S.W.2d 889, 892 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (citing TEX. PROP. CODE § 51.002(e)) (alteration in original); *see also Benitez v. Perales*, No. 01-00-00211-CV, 2002 WL 1981189, at *4 (Tex. App.—Houston [1st Dist.] Aug. 29, 2002, no pet.) (same). "The general purpose of the statute is to provide a minimum level of protection for the debtor, and it provides for only constructive notice of the foreclosure." *Onwuteaka*, 846 S.W.2d at 892. Section 51.002(e) requires only that written notice be sent by certified mail; it does not require a debtor to have received the certified mail containing the written notice. *See* TEX. PROP. CODE § 51.002(e); *Stanley v. CitiFinancial Mortg. Co.*, 121 S.W.3d 811, 817 (Tex. App.—Beaumont 2003, pet. denied) (emphasizing that under section 51.002, service by certified mail is complete when the notice is deposited in the mail and that "the statute requires constructive notice" and "there is no requirement of actual notice"); *Benitez*, 2002 WL 1981189, at *4 (rejecting appellant's argument that notice of sale was insufficient under section 51.002 because even though notice was mailed by certified mail, appellant did not receive the certified mail because "[t]here is no requirement that [the debtor] actually receive the notice"). Accordingly, Moreno's testimony that she did not receive the certified mail is not evidence that section 51.002 was violated; her testimony does not rebut subsection (d)'s presumption.[2] *See Onwuteaka*, 846 S.W.2d at 892 (explaining that to

---

[2]We note that Moreno argues she was deprived of due process because she claims Tidwell, Snow, and Gerdes knew that she had not received any certified letters. While Moreno concedes that section 51.002 provides for constructive

establish a violation of section 51.002, "it must be shown that the holder of the debt had in its records the most recent address of the debtor and *failed to mail a notice by certified mail* to that address") (emphasis added); *see also Hill v. Fremont Inv. & Loan*, No. 05-02-01438-CV, 2004 WL 1178607, at *3 (Tex. App.—Dallas May 28, 2004, no pet.) (explaining that because subsections "51.002(b) and (d) of the Texas Property Code only require that the certified mail be deposited for delivery, the fact that appellant may never have received the mail is not dispositive"). We hold the evidence is legally and factually sufficient to show that notice was sent to Moreno in compliance with section 51.002.[3]

### C. Notice of Intent to Accelerate and Notice of Acceleration

Moreno argues that Tidwell and Snow failed to give "explicit" notice of intent to accelerate the debt and failed to give any notice of acceleration, which Moreno argues invalidates the Foreclosure Deed. Tidwell and Snow respond that Moreno's argument is without merit because Moreno contractually waived her right to any such notice under the Deed of Trust and Promissory Note. Tidwell and Snow emphasize that the trial court found that "no defect occurred in the foreclosure sale proceedings resulting in the Foreclosure Sale Deed" and that the "Foreclosure Deed is a valid deed." According to Tidwell and Snow, by making the above findings of fact, the

---

notice and that notice is complete when deposited in the mail, she nevertheless claims that notice cannot be valid when the sender knows it was not delivered and knows the certified mail was returned to the sender. According to Moreno, "constructive notice must be reasonably calculated to provide notice." We do not find Moreno's distinction persuasive. By its explicit terms, section 51.002 provides that notice by certified mail is complete when deposited in the mail, and sending written notice by certified mail is reasonably calculated to provide notice. Under Moreno's argument, parties could avoid notice by failing to sign for certified mail and allowing the certified mail to be returned. *See Hill v. Fremont Inv. & Loan*, No. 05-02-01438-CV, 2004 WL 1178607, at *3 (Tex. App.—Dallas May 28, 2004, no pet.) (holding fact appellant never received mail is not dispositive under section 51.002(b) and (d), and noting that "[i]ndeed, due to the postal notification entries on the letters' envelopes, one could divine that appellant chose not to receive the mailed notice of trustee's sale").

[3]We note that Moreno further argues that the evidence is insufficient because there is no evidence that a copy of written notice was sent by first-class mail. In other words, Moreno argues that notice under section 51.002 requires written notice to be sent by certified mail *and* by regular first-class mail. However, by its explicit language, section 51.002 does not require written notice to be sent by both certified mail and by regular first-class mail. Thus, we reject Moreno's argument. *See* TEX. PROP. CODE § 51.002(e).

trial court implicitly found that notice of such specific intent to accelerate and notice of acceleration to Moreno was not required under the Note and Deed of Trust.

"A debtor may waive his right to demand, presentment, and notice." *Adams v. First Nat'l Bank*, 154 S.W.3d 859, 868 (Tex. App.—Dallas 2005, no pet.) (citing *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 892 (Tex. 1991)). "A waiver of presentment, notice of intent to accelerate, and notice of acceleration is effective only if it is clear and unequivocal." *Id.* (citing *Shumway*, 801 S.W.2d at 893). "The Note and the Deed of Trust must be construed together because they were signed by the same parties on the same day, identify the same subject matter, each document references the other, and the deed of trust is identified as the security for the note." *Id.*

Here, The Deed of Trust provides "Grantors and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) *notice of intention to accelerate maturity*, (d) *notice of acceleration of maturity*, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code." (emphasis added). Similarly, the Note provides:

> If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Notwithstanding any other provision of this note, in the event of default, before exercising any of Lender's remedies under this note or any deed of trust or warranty deed with vendor's lien securing it, Lender will first give Borrower written notice of default and Borrower will have ten days after notice is given in which to cure the default. If the default is not cured ten days after notice, Borrower and each surety, endorser, and guarantor *waive* all demand for payment, presentation for payment, *notice of intention to accelerate maturity, notice of acceleration of maturity*, protest, and notice of protest, to the extent permitted by law.

(emphasis added). The above language is clear and unequivocal. *See Adams*, 154 S.W.3d at 868. Thus, Moreno waived her right to receive notice of intent to acceleration and notice of acceleration

under the Deed of Trust and the Promissory Note. We find no error by the trial court in determining that no defect occurred in the foreclosure sale proceedings.

### D. Right to Accelerate the Note

Moreno argues that Tidwell and Snow waived their right to accelerate the note by accepting payments from Moreno. According to Moreno, accepting late payments has been held to preclude accelerating maturity without giving a second notice of default and an opportunity to cure. In support of this assertion, Moreno cites a 1983 court of appeals opinion, *Dhanani Investments, Inc. v. Second Master Bilt Homes, Inc.*, 650 S.W.2d 220 (Tex. App.—Fort Worth 1983, no writ). In the context of an appeal from a trial court's order denying a motion for temporary injunction, the court in *Dhanani* held that the "[f]oreclosure threats" "were not sufficient to put the maker on notice of necessity for strict compliance of payment on due date, particularly since after such 'threats,' the payments for February, March, April and May were accepted even though not timely made." *Id*. at 223. Under those facts, the court of appeals held that the trial court had erred in denying the mortgagor's application for temporary injunction to prevent the mortgagee from selling real property at a foreclosure sale. *Id*.

This type of waiver by the mortgagee is an affirmative defense. *See Babineaux v. Citimortgage, Inc.*, No. 02-17-00124-CV, 2017 WL 6616239, at *5 (Tex. App.—Fort Worth Dec. 21, 2017, pet. denied); *see Thomas v. Compass Bank*, No. 01-01-00467-CV, 2002 WL 1340333, at *4 (Tex. App.—Houston [1st Dist.] June 20, 2002, no pet.) ("Waiver is an affirmative defense, not a cause of action, and does not operate to create liability."). It is also dependent on the facts showing "the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right." *Lagow v. Hamon*, 384 S.W.3d 411, 418 (Tex. App.—Dallas 2012, no pet.) (quoting *Perry Homes v. Cull*, 258 S.W.3d 580, 602 (Tex. 2008)).

"The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right." *Id*. (quoting *Perry Homes*, 258 S.W.3d at 602-03); *see also Fernandez v. Bank of N.Y. Mellon*, No. 7:12-CV-206, 2013 WL 12106884, at *3 (S.D. Tex. Jan. 22, 2013) (discussing possible waiver by mortgagee to accelerate note in context of Texas foreclosure proceedings).

Here, the trial court found no waiver on the part of Tidwell and Snow. As the party challenging an adverse finding on which she had the burden of proof, Moreno has a high burden of showing that the trial court erred in making this fact finding. As noted previously, when an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which she had the burden of proof at trial, "she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem.*, 46 S.W.3d at 241. "In a 'matter of law' challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *NAC Tex Hotel*, 481 S.W.3d at 331 (citing *Dow Chem.*, 46 S.W.3d at 241). "If there is no evidence to support the finding, we will examine the entire record in order to determine whether the contrary proposition is established as a matter of law." *Id*. (citing *Dow Chem.*, 46 S.W.3d at 241). The legal sufficiency challenge will be sustained only "if the contrary proposition is conclusively established." *Dow Chem.*, 46 S.W.3d at 241.

When an appellant challenges the factual sufficiency of an adverse finding on which she had the burden of proof at trial, the appellant brings a "great weight and preponderance" issue and "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242. In reviewing this challenge, we "must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the

finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*.

In her brief, Moreno states that Tidwell and Snow accepted her payments from November 2, 2016 (the date of the certified notice of default and acceleration letter) through March 7, 2017 (the date of the foreclosure sale). Thus, she argues that as a matter of law, Tidwell and Snow could not go through with the foreclosure sale without providing a new notice of default and acceleration of the note. There was evidence presented at trial, however, that Moreno was not in default based on her monthly mortgage payments. She was in default for failing to pay the 2015 property taxes.[4] Thus, the actions by Tidwell and Snow of accepting her monthly mortgage payments were not inconsistent with their position that she was in default for failing to pay the 2015 property taxes. We conclude the evidence is legally and factually sufficient to support the trial court's finding of no waiver by Tidwell and Snow.

Moreno further argues that Tidwell and Snow waived their foreclosure by allowing Moreno to keep possession of the Property and by accepting payments from Moreno. In her brief, Moreno contends that Tidwell and Snow

> waived their foreclosure action when they (1) told [Moreno] nothing would change from the October 2015 agreement; (2) never told [Moreno] about the foreclosure action; (3) never reached a new agreement with [Moreno]; (4) accepted over four years' worth of payments from [Moreno]; (5) told [Moreno] she could sell the house to [Tidwell and Snow] for $75,000.00; (6) represented in a judicial proceeding that [Moreno] had the right to buy the property; and (7) admit that the 2015 agreement just continued on. Clearly a waiver can be inferred from conduct of [Tidwell and

---

[4]We note that in her brief, Moreno argues that Tidwell and Snow "admit that the funds for the 2015 taxes were paid by [Moreno]" and point to Plaintiff's Exhibit 5, which is the tax receipt from the Uvalde County Appraisal District showing that the 2015 property taxes were paid by R L Gibson Jr. on January 27, 2017. That the taxes were paid by R L Gibson Jr., Tidwell and Snow's father, does not provide conclusive evidence that *Moreno* paid the 2015 property taxes. Moreno fails to acknowledge the plethora of other evidence presented at trial that shows she failed to pay the 2015 property taxes before the foreclosure sale. As the factfinder, the trial court was the sole judge of the credibility of the witnesses and the weight to give their testimony. *Donias*, 649 S.W.3d at 793. We hold the evidence was legally and factually sufficient to support the finding that Moreno had failed to pay the 2015 property taxes before the foreclosure sale.

Snow] from March 7, 2017 through November 10, 2021 that they had no intention of acting on their foreclosure.

However, in making this argument, Moreno ignores evidence presented at trial that contradicts her assertions. There was evidence that after the foreclosure, Moreno was told she could stay in the Property by either renting it or by purchasing it again from Tidwell and Snow by obtaining third-party financing for the price of $75,000. There was evidence that although Moreno said she wanted to obtain third-party financing and purchase the property again, Moreno never followed through. Again, as explained above, because waiver is an affirmative defense, Moreno has a high burden to show that the trial court's finding of no waiver is not supported by legally and factually sufficient evidence. *See Dow Chem.*, 46 S.W.3d at 241-42. Moreno has failed to make this showing.

### E. *Accident, Mistake, or Inequitable Conduct*

Moreno next argues that Tidwell and Snow are prevented from accelerating maturity of the note because Moreno's default was the result of accident, mistake, or the inequitable conduct by Tidwell and Snow. Moreno argues (1) she was never in default and she had paid in full, (2) the parties were confused about "the actual sales price" of the Property; (3) the debt was paid in full before the date of the notice of the Foreclosure Sale; and (4) Gibson failed to follow the protections of section 34.21 of the Texas Tax Code. Moreno again cites only to evidence favorable to her position and ignores evidence presented at trial to the contrary.

Moreno argues that the evidence shows she was not in default and that there was "just confusion" surrounding the death of Tidwell and Snow's mother and their understanding of the payments their mother had received. According to Moreno, there was "confusion" over the original sales price. However, testimony from Tidwell and Snow, along with the closing documents, constitute legally and factually sufficient evidence in support of the finding that the original sales

price was $85,000, with $5,000 as a down payment, and $80,000 to be owner financed through a promissory note.

The evidence is legally and factually sufficient to show that Moreno was in default for failing to pay the 2015 property taxes and failing to cure that default before the foreclosure sale. The Deed of Trust required Moreno to "pay all taxes and assessments on the Property before delinquency." The Note authorized the lender to accelerate the note if the borrower defaulted "in the performance of any obligation in any instrument securing or collateral to this note." It states that the borrower defaults under the terms of the Note by failing to "perform any obligation or covenant in any written agreement between Lender and Borrower." While Moreno argues that on January 27, 2017, she paid the 2015 taxes before the foreclosure sale, in support of this assertion she relies on the tax receipt from the appraisal district showing that the 2015 property taxes were paid on January 27, 2017 by R L Gibson Jr. Moreno appears to be relying on her testimony that she gave the tax money to the Gibsons. However, there was other evidence at trial, including testimony from Tidwell and Snow, that Moreno did not submit any payments to the Gibsons for the 2015 property taxes until June 30, 2017, which was after the foreclosure sale. Further, in her trial testimony, Moreno admitted that before June 30, 2017, she did not make any additional payments for the property taxes other than her normal mortgage payments. Again, from her testimony, it appears Moreno incorrectly believed that her down payment at closing was payment for the property taxes. When there is conflicting evidence, the resolution of such conflict is within the discretion of the trier of fact. *City of Keller*, 168 S.W.3d at 820; *see Bekins*, 717 S.W.3d at 94 (explaining that as the sole judge of the credibility of the witnesses, the trial court was free to draw its own deductions from all the evidence and was not bound by the testimony of any witness). We

hold the evidence is legally and factually sufficient to support the finding that Moreno was in default at the time of the foreclosure sale.

### F. Reinstatement Agreement?

Moreno further argues that after the foreclosure sale, Tidwell and Snow entered into a reinstatement agreement with Moreno on March 10, 2017. According to Moreno, by entering into a reinstatement agreement, Tidwell and Snow are estopped from denying the original sales contract governed the parties' conduct. Moreno argues that "[a]fter executing the reinstatement agreement, the parties essentially continued their relationship under the original note as though default never happened." Similarly, Moreno argues that Tidwell and Snow ratified or revived the original sales agreement by accepting payments after foreclosure. Moreno also contends that Tidwell and Snow "are barred by promissory estoppel as well." In response, Tidwell and Snow emphasize that the trial court found that they "did not enter into an agreement with [Moreno] for [Moreno] to purchase the Real Property after March 7, 2017." The trial court also found that they "did not represent to [Moreno] that the terms of the October 20, 2015 contract were in full force and effect at any time after March 7, 2017." We agree with Tidwell and Snow that legally and factually sufficient evidence support these findings by the trial court.

Tidwell testified that after the foreclosure sale, she offered to permit Moreno to "rent" the Property or to purchase the Property through third-party financing. There was also evidence that Tidwell sent Moreno a letter dated November 2, 2017, in which Tidwell discussed Moreno's options to either purchase or rent the Property. Tidwell and Snow testified Moreno said she would obtain third-party financing but never followed through with doing so and then would not communicate with them. In a letter addressed to Moreno on November 28, 2018, Tidwell and Snow demanded that Moreno vacate the Property for failing to "pay *rent* and back taxes, *as was*

*our agreement*." (emphasis added). In a letter dated September 30, 2020, Tidwell and Snow offered again to sell the Property to Moreno. In another letter dated December 26, 2020, Tidwell and Snow stated that Moreno's "*December rent payment*" was twenty-six days past due. (emphasis added). Tidwell stated that Moreno had "been 15 days or more behind on *paying [her] rent for several months*" and reiterated that her payments were due on the first day of the month. (emphasis added). Tidwell and Snow stated that they wanted "to know when [Moreno could] meet with [them] in person to discuss the sell [sic] of the" Property and reminded Moreno that they had previously "offered it to [Moreno] for $75,000 even though it is appraised at the county tax office for over $89,000." Tidwell again referred to Moreno paying rent in a letter dated January 7, 2021: "As previously discussed, on several occasions, over the last months we *do not want to rent the property any longer*." (emphasis added). In letters dated March 27, 2021 and June 24, 2021, Tidwell again stated she and Snow no longer wanted to "rent" the Property to Moreno. As the factfinder, the trial court was free to believe the evidence in support of Tidwell and Snow renting the Property to Moreno after the foreclosure sale and not find credible Moreno's testimony that she never knew about the foreclosure or agreed to rent the Property. *City of Keller*, 168 S.W.3d at 819. Thus, we reject Moreno's argument about a reinstatement agreement.

### G. Redemption?

Moreno further contends that if Tidwell and Snow's father, R L Gibson Jr., paid the 2015 property taxes without communicating that he did so to Moreno, then Moreno was entitled to the "protections of the Texas Tax Code that allows for redemption." In support of this assertion, Moreno cites to section 34.21 of the Texas Tax Code. Section 34.21, however, does not apply in this case. Section 34.21 applies when real property is seized under a tax warrant or sold pursuant to foreclosure of a tax lien. *See* TEX. TAX CODE § 34.21; *see Deutsche Bank Nat'l Trust Co. v.*

*Stockdick Land Co.*, 367 S.W.3d 308, 313 (Tex. App.—Houston [14th Dist.], 2012, pet. denied) (discussing redemption procedures when a taxing authority forecloses for nonpayment of property taxes and the property is sold at a tax sale). Here, the Property was sold pursuant to a nonjudicial foreclosure sale after Moreno defaulted on her obligations contained in the loan documents. The property was not sold at a tax sale initiated by a taxing authority for failure to pay property taxes. Thus, we hold that section 34.21 of the Tax Code is not applicable.

### H.  Rescission?

Alternatively, Moreno contends that by paying the 2015 property taxes to Tidwell and Snow on June 30, 2017, which was three months after the foreclosure sale, she redeemed the Property. In support of this assertion, she cites to section 51.016(m) of the Property Code and states that she could not find any caselaw interpreting section 51.016(m).

The Property in this case was sold pursuant to a nonjudicial foreclosure sale under section 51.002 of the Property Code. Section 51.016(a) states that "[t]his section applies only to a nonjudicial foreclosure sale of residential real property conducted under Section 51.002." TEX. PROP. CODE § 51.016(a). Subsection(b) provides the circumstances under which a mortgagee can rescind a nonjudicial foreclosure sale of real property conducted under section 51.002:

> *Not later than the 15th calendar day after the date of a foreclosure sale*, a mortgagee, trustee, or substitute trustee may rescind the sale under this section if:
>
> (1) the statutory requirements for the sale were not satisfied;
>
> (2) the default leading to the sale was cured before the sale;
>
> (3) a receivership or dependent probate administration involving the property was pending at the time of sale;
>
> (4) a condition specified in the conditions of sale prescribed by the trustee or substitute trustee before the sale and made available in writing to prospective bidders at the sale was not met;

(5) the mortgagee or mortgage servicer and the debtor agreed before the sale to cancel the sale based on an enforceable written agreement by the debtor to cure the default; or

(6) at the time of the sale, a court-ordered or automatic stay of the sale imposed in a bankruptcy case filed by a person with an interest in the property was in effect.

TEX. PROP. CODE § 51.016(b) (emphasis added). Moreno cannot rely on subsection (b) because she did not pay the 2015 property taxes to Tidwell and Snow until more than fifteen days after the nonjudicial foreclosure sale. Instead, Moreno points to subsection (m), which provides that "[n]othing in this section prohibits the rescission of a sale by agreement of the affected parties on other terms or a suit to rescind a sale not rescinded under this section." TEX. PROP. CODE § 51.016(m). By its plain terms, subsection (m) does not allow for rescission on its own.

In her brief, Moreno then states that the Texas Supreme Court "also recognizes equitable rescission." *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 751 (Tex. 2009) (explaining that equitable rescission was available remedy based on mutual mistake in the conveyance of the property). In support of this equitable rescission argument, Moreno claims that on March 10, 2017, she reached an agreement with Tidwell and Snow that the original October 20, 2015 "agreement would continue." According to Moreno, Tidwell and Snow "continued in this representation to [Moreno] through June 24, 2022, for over six years." Moreno then argues the trial court erred "by granting relief to [Tidwell and Snow] by allowing them to rescind their admitted agreement with" her. Again, Moreno focuses only on evidence that supports her factual assertions and ignores evidence to the contrary. There is legally and factually sufficient evidence in this case to support the finding that after the foreclosure sale, Tidwell and Snow offered to allow Moreno to stay in the Property if she either rented the Property or procured third-party financing to purchase the property again from Tidwell and Snow. On appeal, Moreno has not met her burden

of showing under the appropriate standards of review for legal and factual sufficiency that the parties agreed "to continue" the original October 20, 2015 sale.

### I. Abandonment or Ratification?

Additionally, Moreno argues that Tidwell and Snow abandoned their foreclosure as a matter of law by accepting payments from her after foreclosure. Moreno recognizes that "[a]bandonment is based on the concept of waiver and requires proof that the party has an existing right, has actual knowledge of the right, and intends to relinquish the right or engages in intentional conduct inconsistent with the right." *Citibank N.A. v. Pechua, Inc.*, 624 S.W.3d 633, 638 (Tex. App.—Houston [14th Dist.] 2021, pet. denied). She further recognizes that abandonment is generally a question of fact but argues that it can be determined as a matter of law in this appeal. *See id.* ("Whether a lender has abandoned an acceleration is generally a question of fact, but when the facts are admitted or clearly established, abandonment may be determined as a matter of law."). For the same reasons we held that Moreno had not met her burden of showing waiver as a matter of law, we hold that she has not shown abandonment here as a matter of law.

Moreno further argues that Tidwell and Snow ratified or revived the original 2015 sales agreement with Moreno. "Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that did not then legally bind him and which he could have repudiated." *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 505 (Tex. App.—San Antonio 2014, pet. denied) (quoting *K.B. v. N.B.*, 811 S.W.2d 634, 638 (Tex. App.—San Antonio 1991, writ denied)). "Proof of ratification requires evidence establishing '(1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act.'" *Id.* at 505-06 (quoting *K.B.*, 811 S.W.2d at 638). "Any act taken by a party that is 'inconsistent with an intention to avoid the agreement' effectively waives

the party's right of rescission." *Id*. at 506 (quoting *Cordero v. Tenet Healthcare Corp.*, 226 S.W.3d 747, 750 (Tex. App.—Dallas 2007, pet. denied)). "Once a party ratifies an agreement, that party may not later withdraw the ratification and seek to avoid the agreement." *Id*. (quoting *Cordero*, 226 S.W.3d at 750). "The burden rests on the party asserting 'ratification [to] prove that the ratifying party acted upon full knowledge of all material facts.'" *Id.* (quoting *K.B.*, 811 S.W.2d at 638) (alteration in original). For the same reasons we held that Moreno had not shown waiver, we hold that Moreno has not met her burden of showing as a matter of law that Tidwell and Snow ratified or revived the 2015 sales agreement with Moreno.

**FORECLOSURE DEED**

Moreno argues that the trial court's conclusion of law that the March 7, 2017 foreclosure deed is a valid deed is "clearly erroneous in law and fact," "constitutes legal error," and "violates the substantive and procedural due process rights afford[ed] appellant." She first argues the foreclosure deed is void because (1) there was no default at the time of the sale, and (2) Tidwell and Snow did not follow the tax code procedure to allow the foreclosure sale to proceed. We have rejected these arguments above.

Moreno also argues "there was a complete failure of due process on the Appellant" because "she was never served with (a) notice of default, (b) intent to accelerate, (c) notice of acceleration, (d) notice of foreclosure sale, or (e) notice of a foreclosure sale." She argues that the first time she became aware of a foreclosure sale was in November 2021. This argument by Moreno is premised on Moreno never being served with the required notices. However, as discussed previously, there is legally and factually sufficient evidence that Moreno received the required notice. Thus, the premise of Moreno's argument is not valid. To the extent Moreno is arguing that the manner in which Texas courts have interpreted the sufficiency of the required notice, we note that courts have

held that the Texas nonjudicial foreclosure statute does not violate the due process clause under the Constitution because the foreclosing party is not a state actor. *See Williamson v. Tucker*, 615 S.W.2d 881, 892 (Tex. App.—Dallas 1981, writ ref'd n.r.e.) (rejecting defendant's defense that article 3810 of the Texas Revised Civil Statutes, which was the predecessor to section 51.002 of the Texas Property Code, was "unconstitutional under the Fourteenth Amendment because it results in a taking of property without due process of law" and explaining that "[n]o significant state action is involved in a foreclosure as provided for under article 3810"); *see also Williams v. Cheyenne Crossing Residential Ass'n, Inc.*, No. 4:10cv34, 2010 WL 5287509, at *3 (E.D. Tex. Dec. 17, 2010) ("Plaintiffs have failed to point the court to any governing authority challenging the constitutionality of non-judicial foreclosures . . . and they have not offered any binding authority in response to Defendant's argument that it is not a state actor").

## STATUTE OF LIMITATIONS

Moreno argues that the trial court erred in its Conclusions of Law Numbers Six through Twenty by determining that the statute of limitations barred her claims against Tidwell and Snow.[5] She argues that Tidwell and Snow breached their agreement with her on November 10, 2021 when they filed "an invalid eviction proceeding." She argues that filing her lawsuit three months later "to vindicate her rights" was timely under the applicable statute of limitations.

"Whether a claim is barred by the statute of limitations is a legal question we review de novo." *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 787 (Tex. App.—Houston [14th Dist.] 2016, no pet.). A suit for wrongful foreclosure to recover real property is governed by a four-year

---

[5]The trial court determined the following causes of action brought by Moreno were barred by limitations: (1) Texas DTPA; (2) common law fraud; (3) fraud in a real estate transaction; (4) negligence; (5) negligent misrepresentation; (6) breach of contract; (7) Texas Uniform Fraudulent Transfer Act; (8) conspiracy; (9) abuse of process; (10) tortious interference with a contract; (11) money had and received; (12) fraud by nondisclosure; (13) Theft Liability Act; (14) wrongful foreclosure; and (15) breach of an executory contract.

statute of limitations, and "the limitations period begins to run from the date of foreclosure." *Mitchell v. Armstrong Cap. Corp.*, No. 14-94-00896-CV, 1996 WL 354744 (Tex. App.—Houston [14th Dist.] June 27, 1996, no writ); *see* TEX. CIV. PRAC. & REM. CODE § 16.035(a) ("A person must bring suit for the recovery of real property under a real property lien or the foreclosure of a real property lien not later than four years after the day the cause of action accrues."); *Gonzales v. Lockwood Lumber Co.*, 668 S.W.2d 813, 815 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding suit for wrongful foreclosure of a deed of trust "is obviously grounded on a written contract and the four-year statute of limitations should have been applied"). Here, there is legally and factually sufficient evidence to support the trial court's finding that the foreclosure sale occurred on March 7, 2017. As Moreno filed her lawsuit on February 25, 2022, the trial court did not err in concluding her wrongful foreclosure claim was barred by the statute of limitations.

We note that Moreno argues the statute of limitations is inapplicable because the foreclosure sale and deed is void. We have already rejected Moreno's arguments that the foreclosure sale and deed are void.

We note that Moreno argues that pursuant to section 16.035(e) of the Texas Civil Practice and Remedies Code, the statute of limitations does not begin to accrue on the original 2015 contract until the last installment on September 20, 2030. Section 16.035(e), however, is inapplicable to the facts presented here. Section 16.035(e) specifies the accrual date of a lienholder's claim:

> If a series of notes or obligations or a note or obligation payable in installments is secured by a real property lien, the four-year limitations period does not begin to run until the maturity date of the last note, obligation, or installment.

TEX. CIV. PRAC. & REM. CODE § 16.035(e). In *Mitchell v. Armstrong Capital Corp.*, 1996 WL 354744, at *4 (Tex. App.—Houston [14th Dist.] June 27, 1996, no writ), the Fourteenth Court of Appeals rejected the argument from a plaintiff that her cause of action against the lienholder did

not accrue under section 16.035(e) until four years after the date of the last installment under the note was due. The court of appeals explained that the plaintiff had "cite[d] no case law interpreting [s]ection 16.035(e) in this manner, and [the court] saw no basis to interpret it other than as a limitations statute for actions by *holders* of liens on real property." *Id*. (emphasis in original). The court thus concluded section 16.035(e) "ha[d] no application to [the plaintiff]'s claims in this case." *Id*. We agree with this reasoning by the Fourteenth Court of Appeals and likewise conclude that section 16.035(e) is inapplicable to Moreno's claims.

Moreno further argues that Tidwell and Snow are estopped from asserting limitations. Moreno emphasizes that "[e]stoppel may bar a limitations defense when a party, or its agent or representative, makes representations that induce plaintiffs to delay filing suit within the applicable limitations period." *Palais Royal, Inc. v. Gunnels*, 976 S.W.2d 837, 849 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd by agr.). According to Moreno, Tidwell and Snow "never told [Moreno] that she didn't own the property or about the foreclosure sale." Once again, there is legally and factually sufficient evidence to support the finding that Tidwell and Snow did in fact inform Moreno of both. Moreno claims that Tidwell and Snow represented to her that she could "sell" the Property to them for $75,000, pointing to a proposed real estate contract where Moreno was listed as the seller and Tidwell and Snow were listed as the buyers. In her brief, Moreno points out many of these "gotcha" moments in the testimony at trial, which she argues conclusively proves a fact. However, from *all the evidence presented at trial*, the trial court could have rationally and reasonably concluded that Moreno being listed in this proposed contract that was never actually entered into by the parties was merely a typographical error on the part of Tidwell and Snow. In evaluating *all the evidence* and the credibility of the witnesses, the trial court could rationally and reasonably have concluded that Tidwell and Moreno did in fact inform Moreno of the foreclosure

sale, informed her of her options to either rent the Property or buy the Property from them again with third-party financing, and attempted for a great while to work with Moreno before they finally moved to evict her. *See City of Keller*, 168 S.W.3d at 819. On appeal, Moreno has failed in her burden to show that estoppel should apply.

Moreno further argues the statute of limitations is inapplicable when there was fraudulent concealment. "Fraudulent concealment tolls limitations because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011) (citations omitted). It is "an equitable doctrine that is fact-specific." *Id*. "A defendant's concealment of wrongdoing may toll the running of limitations" if the plaintiff proves the defendant "actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong." *Id*. (citations omitted). However, even under these facts, "fraudulent concealment only tolls the statute of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Id*. (citations omitted).

Here, Moreno argues that Tidwell and Snow knew the Property had been foreclosed on and did not inform Moreno of that fact. She argues Tidwell and Snow "concealed their wrong by informing her that the 'only' change they wanted was to be paid monthly for the taxes and she was still 'buying' the Property. Here, the trial court found that Tidwell made no false representation of material fact to Moreno regarding the Property and that Tidwell "did not represent to [Moreno] that the terms of the October 20, 2015 contract were in full force and effect at any time after March 7, 2017." The trial court also found "no fraudulent concealment or failure to disclose by [Tidwell]." To support her argument, Moreno relies on Tidwell's deposition testimony in which Tidwell mistakenly stated that Moreno held equity in the Property. At trial, Tidwell clarified that she was confused about the time period she was asked about in her deposition. This is a credibility question

for which the trial court as factfinder is the sole judge. *See City of Keller*, 168 S.W.3d at 819. In looking at *all* the evidence, we conclude the evidence is legally and factually sufficient to support these findings.

Moreno further argues the statute of limitations is inapplicable where there is a continuing tort. *See BNSF Ry. Co. v. Acosta*, 449 S.W.3d 885, 894 (Tex. App.—El Paso 2014, no pet.) ("Under the continuing tort doctrine, the cause of action is not complete and does not accrue until the tortious acts have ceased."). According to Moreno, when she made every monthly payment, she "should have been building equity in her home under the executory contract." She contends that "[e]very time [Tidwell and Snow] accepted [her] money, they were stealing from her or breaching their contract." Thus, she concludes that the statute of limitations did not begin to run until November 2021 when Tidwell and Snow attempted to evict her. Once again, Moreno's argument is premised on her version of the facts. Moreno has not shown on appeal that the trial court erred in failing to find that a continuing tort tolled the statute of limitations.

Moreno also argues that the discovery rule prevents the running of the statute of limitations. The discovery rule is "a very limited exception to statutes of limitations, which defers the accrual of the cause of action until the injury was or could have reasonably been discovered." *Shell Oil*, 356 S.W.3d at 929-30 (citation omitted). It applies "only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Id*. at 930. "An injury is inherently undiscoverable if by its nature, it is unlikely to be discovered within the prescribed limitations period despite due diligence." *Id*. (citation omitted). Moreno argues that Tidwell and Snow "prevented [her] from knowing about the foreclosure sale." Without regard to the merits of whether a foreclosure is inherently undiscoverable, we note that there is legally and factually sufficient evidence from which the trial court could reasonably determine that Tidwell and Snow did not

prevent Moreno from learning about the foreclosure sale. Thus, we hold the trial court did not err in determining the statute of limitations barred Moreno's claims.

We note that Moreno also argues that "[t]here is no statute of limitations for quite [sic] title action" and that "[q]uite [sic] title can be used as a workaround on a wrongful foreclosure action that is time barred." Thus, Moreno appears to be arguing that she can bootstrap her other claims through her suit to quiet title. Moreno further complains that the "trial court did not make any findings on [her] suit for quite [sic] title." "The principal issue in a suit to quiet title is as to the existence of a cloud that equity will remove." *Wright v. Matthews*, 26 S.W.3d 575, 578 (Tex. App.—Beaumont 2000, pet. denied) (citation omitted). "The purpose of a suit to quiet title is 'to enable the holder of the feeblest equity right to remove from his way to legal title any unlawful hindrance having the appearance of a better right.'" *Id*. (quoting *Thomson v. Locke*, 66 Tex. 383, 1 S.W. 112, 115 (Tex. 1886)). "The plaintiff in a suit to quiet title must allege right, title, or ownership in himself or herself with sufficient certainty to enable the court to see he or she has a right of ownership that will warrant judicial interference." *Id*. While Moreno complains the trial court did not make any findings on her suit to quiet title, the trial court did in fact determine the ownership of the Property. It found that the foreclosure deed was a valid deed, that Tidwell and Snow in their individual capacities are the sole owners of the Property, and that Moreno has not held an ownership interest in the Property since March 7, 2017.

In support of her argument that her suit to quiet title cannot be barred by limitations and that her suit to quiet title bootstraps her other claims, Moreno cites a Texas Supreme Court case, *Kyle v. Strasburger*, 522 S.W.3d 461 (Tex. 2017). In *Kyle*, an ex-wife claimed her ex-husband forged her signature on the closing documents without her consent to obtain a $1.1 million home-equity loan, which was secured by a deed of trust on the couple's homestead. *Id*. at 464. She sued

the bank, seeking forfeiture of principal and interest paid on the loan under article XVI, section 50(a)(6)(Q)(xi) of the Texas Constitution, and a declaratory judgment that the special warranty deed conveying her interest in the property to her ex-husband was invalid. *Id*. She also asserted claims against the bank for statutory fraud and for violations of the Texas Finance Code and Texas Deceptive Practices Act, which she alleged stemmed from the bank's misrepresentations "in a foreclosure application about the loan's validity." *Id*. The bank moved for summary judgment on the ground that "the statute of limitations barred [her] forfeiture claim and both declaratory-judgment claims." *Id*. The trial court granted summary judgment. *Id*.

Article XVI, section 50(c) of the Texas Constitution provides that "[n]o mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section . . . ." TEX. CONST. art. XVI, § 50(c). In *Kyle*, the Texas Supreme Court explained that in its previous opinion, *Garafolo v. Ocwen Loan Servicing, L.L.C.*, 497 S.W.3d 474 (Tex. 2016), it had "held that section 50(a), which limits the types of loans that may be secured by a homestead and places particularly strict parameters on foreclosure-eligible home-equity loans, does not create substantive rights beyond a defense to foreclosure of a lien securing a *constitutionally noncompliant loan*." *Kyle*, 522 S.W.3d at 464 (citing *Garofolo*, 497 S.W.3d at 478) (emphasis added). The court explained that in *Garafolo*, it had "addressed section 50(a)(6)'s requirement that home-equity loans contain certain enumerated terms and conditions, including a provision mandating that the lender forfeit all principal and interest for uncured failures to comply with its loan obligations." *Id*. (citing *Garofolo*, 497 S.W.3d at 478).

> We explained that those "terms and conditions . . . are not constitutional rights unto themselves, nor is the forfeiture remedy a constitutional remedy unto itself. Rather, it is just one of the terms and conditions of a home-equity loan must include to be foreclosure-eligible." In other words, the absence of constitutionally mandated terms and conditions in a home-equity loan can act as a shield to foreclosure, but a lender's uncured failure to comply with its loan obligations does not give rise to a

> constitutional cause of action. It can, however, give rise to a breach-of-contract claim.

*Id.* at 464-65 (quoting *Garofolo*, 497 S.W.3d at 478-79). The supreme court then noted that in *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542 (Tex. 2016), it had held "that a lien securing a constitutionally noncompliant home-equity loan is not merely voidable; under section 50(c), such a lien is not valid unless and until the defect in the loan is secured." *Id*. at 465 (citing *Wood*, 505 S.W.3d at 548). The court noted that it further held that "no statute of limitations applies to a borrower's claim to quiet title on such a constitutionally invalid lien." *Id*.

The supreme court held that in light of *Wood*, "the court of appeals erred in holding that the statute of limitations barred [the ex-wife's] request for a declaration that the disputed deed of trust is invalid." *Kyle*, 522 S.W.3d at 465. The supreme court explained that the ex-wife had "submitted some evidence that she did not consent to the lien on her homestead, either at the time of its creation or after the fact, and that the underlying home-equity loan therefore does not comply with [a]rticle XVI, section 50(a)(6) of the Texas Constitution." *Id*. The court noted that "[b]ecause section 50(c) renders *liens securing constitutionally noncompliant home-equity loans invalid until cured*, no statute of limitations applies to [the ex-wife's] claim to declare the lien invalid." *Id*. (emphasis added). The supreme court further held that the court of appeals further erred in finding that the ex-wife's claims for statutory fraud and for violations of the Finance Code and DTPA were barred by limitations because "those claims arise out of [the bank's] allegedly misrepresenting the deed of trust's validity in a foreclosure application and thus are dependent on [the ex-wife's] entitlement to a declaration that the deed of trust is void." *Id*. at 466.

Here, in her first amended original petition, the live pleading, Moreno made no allegations that the mortgage lien in this case was "constitutionally invalid" under section 50(c). Thus, *Kyle*

does not apply in this case. Moreno has failed to show the trial court erred in determining the statute of limitations barred the claims in question.

## EXECUTORY CONTRACT

In her final issue, Moreno argues that if this court determines that the foreclosure sale and deed are valid, then she has an executory contract with Tidwell and Snow under chapter five of the Texas Property Code. She argues that after the foreclosure, she was a holdover tenant, specifically a tenant at will. She then cites law for the proposition that an implied agreement to create a *new lease using the terms of the prior lease* may arise if both parties engage in conduct that manifests such intent. *See Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 108-110 (Tex. App.—Houston [14th Dist.] 1996, no writ). As pointed out by Tidwell and Snow, the first problem with Moreno's analysis is that there was no original lease. There was legally and factually sufficient evidence to support fact findings that there was an original contract for sale, then a foreclosure, and then the parties continued under an oral agreement for Moreno to rent the Property. We agree with Tidwell and Snow that the "holdover" rule invoked by Moreno applies after the termination of a lease and not after a foreclosure. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 915 (Tex. 2013). None of the cases cited by Moreno apply the holdover rule to revive the terms of a real estate purchase.

Moreno's logic continues that "[i]f the foreclosure deed is valid, then [she] is a tenant at will per the October 20, 2015 agreement where is [sic] buying her home without a deed which is the definition of an executory contract under chapter 5 of the Texas Property Code." She then argues that Tidwell and Snow did not comply with any provision of chapter five and thus "are in breach of the executory contract when they exercised the remedy of recession and cancellation without providing notice to" Moreno. According to Moreno, she is "entitled to her equity stake in

the property" and "has the right to cure any alleged default." Tidwell and Snow respond that "[f]or the agreement between the parties to constitute an executory contract, there must have been "an option to purchase" real property "that includes or is combined or executed concurrently with a residential lease agreement." TEX. PROP. CODE § 5.062(a)(2). "An option to purchase is a land contract by which the owner gives another the right to buy property at a fixed price within a certain time." *Brooks v. Acosta*, 581 S.W.3d 485, 487-88 (Tex. App.—Austin 2019, no pet.). We agree with Tidwell and Snow that the evidence is legally and factually sufficient to show that the parties did not agree to any such executory contract. Tidwell and Snow testified that after the foreclosure sale, they offered to allow Moreno to either rent the property or obtain third-party financing to purchase the Property back from them. They both testified Moreno had said she wanted to obtain third-party financing but that she never came back to them saying she had in fact obtained the financing. Tidwell testified that Moreno never would give definitive answers to whether she intended to obtain third-party financing to purchase the Property back from Tidwell and Snow. Moreno, on the other hand, testified that after the date of foreclosure, no one offered to sell her the property, she never considered herself a renter, and she had no desire to rent the Property. The evidence is thus legally and factually sufficient to support findings that the parties never agreed to an executory contract after the foreclosure sale.

## CONCLUSION

Having determined that Moreno's issues lack merit, we affirm the judgment of the trial court.

Adrian A. Spears II, Justice